[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-12118
_____

D.C. Docket No. 6:11-cv-01387-GAP-GJK

DOROTHY MCCULLUM,
individually and as parent of DF & TF,
JIMMY FRAZIER,
individually and as parent of DF & TF,

Plaintiffs-Appellants,

versus

ORLANDO REGIONAL HEALTHCARE SYSTEM, INC.,
d.b.a. Arnold Palmer Hospital for Children,
NORTH BREVARD COUNTY HOSPITAL DISTRICT,
d.b.a. Parrish Medical Center,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 3, 2014)

Before ED CARNES, Chief Judge, DUBINA and SILER,[*] Circuit Judges.

ED CARNES, Chief Judge:

It's often said that the path to perdition is paved with good intentions.  It might also be said that sometimes the road to the courthouse is littered with the efforts of well-meaning people who never thought they'd be taking the trip.  This is one of those kind of cases.

When he was fourteen years old, D.F. was diagnosed with ulcerative colitis, a serious disease that affects the colon.  He was hospitalized at Parrish Medical Center for twenty days and the Arnold Palmer Hospital for Children for eleven days to receive treatment and have his colon removed.  At least one of D.F.'s parents remained by his bedside, as any loving parent would, at all times during those two hospital stays.

Because D.F. is deaf and mute, the staff at both hospitals took steps to ensure that they were able to effectively communicate with him.  They used written notes and visual aids, and they also relied on D.F.'s parents and deaf sister, who interpreted for D.F. using sign language.  The staff believed that they had taken appropriate steps to communicate effectively with the child while he was hospitalized, but they did not provide him with a professionally trained sign

---

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit Court of Appeals, sitting by designation.

language interpreter nor did they ask him or his parents whether they wanted one to be provided. The failure to do so led to this lawsuit.

D.F.'s parents brought this disability discrimination lawsuit individually and on behalf of D.F. and his deaf sister. The district court dismissed the individual claims asserted by D.F.'s parents and sister for lack of standing, and it granted summary judgment to the defendants on the claims that D.F.'s parents brought on his behalf seeking damages and injunctive relief. This is the plaintiffs' appeal.

## I.

## A.

On March 19, 2009, D.F. began experiencing severe abdominal pain and his mother, Dorothy McCullum, took him to the emergency room at Parrish Medical Center (Parrish). As part of the intake process, the ER staff noted that D.F. was deaf. When the ER doctor came to examine D.F., he asked him how he was feeling. D.F. did not respond to the question, and McCullum explained that her son was deaf. The doctor asked McCullum if she knew sign language, and she replied that she could "do some signing." The doctor then asked her about D.F.'s symptoms, and she told him that he had been vomiting and having diarrhea. After examining D.F.'s stomach, the doctor told McCullum that her son needed to have a CAT scan so they could determine what was wrong. D.F. was formally admitted to the hospital when the CAT scan revealed that he had blood in his

3

colon.  He remained at Parrish until April 8, 2009, and during that time he underwent a variety of tests and had a colonoscopy to determine the source of his ailment.  At least one of his parents was with him throughout his entire stay.

Since 1996, Parrish has had a written policy in place titled "Communication with Impaired or Language Barrier Patients."  That policy states that the hospital "will provide for appropriate communication with patients who experience communication barriers," which may include providing interpreters for hearing-impaired patients.  It further provides that the hospital staff will communicate with a hearing-impaired patient by using the patient's preferred method of communication.  During D.F.'s stay at Parrish, the hospital's staff relied on a variety of methods to facilitate communication with him.  One nurse who had taken several college classes in sign language communicated with D.F. by signing.  Other staff members used written notes to communicate with D.F.  When staff members consulted with D.F. and his parents about his treatment, they often used printed handouts to enhance communication and understanding.  Parrish doctors and nurses also communicated with the help of McCullum (D.F.'s mother), Jimmy Frazier (D.F.'s father), and T.F. (D.F.'s deaf sister),[1] all of whom interpreted for

---

[1] Throughout this opinion, we use "parents" when referring to both McCullum and Frazier.  We refer to the parents individually as either "mother" or "father," and we refer to T.F. as "sister."

D.F. using "home signs" (made up sign language), American Sign Language (ASL) finger spelling, and their otherwise limited knowledge of ASL.

While D.F. was a patient at Parrish, nobody at the hospital directly told him or his parents that the hospital could provide a sign language interpreter. The parents did not know that they could request an interpreter, thinking instead that they were obligated to help their son communicate. As a result, neither D.F. nor his parents ever requested an interpreter. D.F. claims that he did not fully understand what was happening to him while he was at Parrish, but there is no evidence that he or his parents informed the Parrish doctors or nurses that some of their statements were being lost in translation. To the contrary, D.F.'s attending physician believed that he was effectively communicating with D.F. through the mother's translations. D.F.'s medical records also indicate that D.F. "nod[ded] understanding" or "verbalize[d] understanding" when the Parrish nurses communicated with him about his treatment.

### B.

On April 8, 2009, after D.F.'s condition failed to improve, he was transferred to the pediatric critical care unit at the Arnold Palmer Hospital for Children (Arnold Palmer) in Orlando. Arnold Palmer is a private hospital that offers special treatment programs for children. Similar to Parrish, Arnold Palmer has a written policy, in effect since 1987, addressing accommodations that will be

5

made for patients with communication barriers.  That policy provides that a

qualified interpreter will be offered to every patient who needs communication

support, though for children it allows the patient's adult family members or friends

to interpret if they are comfortable doing so and understand the non-clinical

information to be interpreted.  The hospital publicizes its policy by posting signs

throughout the hospital informing patients that interpretation services are available.

When D.F. arrived at Arnold Palmer, he and his father met with Dr. Carey

McCade to discuss D.F.'s treatment plan.  During that discussion the father

interpreted for his son.  The doctors at Arnold Palmer determined that surgery

would be necessary, and the surgeon who would be performing the operation met

with D.F.'s family the day after D.F. was admitted to the hospital to discuss the

need for the procedure and the associated risks.  Kimberly Burbage, a Child Life

Specialist,[2] met with D.F. and his parents to prepare them for the operation and

educate them about the procedure.  During that consultation, Burbage relied in part

on the parents to help interpret for D.F.  But she also used other communication

aids to help D.F. understand what he would be going through.  After noting that

D.F.'s learning preferences included "pictorial[s]" and "skill demonstration,"

---

[2] Child Life Specialists are healthcare professionals who are specifically trained to "use their knowledge of child development and developmentally appropriate interventions to educate, prepare and support children through difficult tests, procedures, and the sometimes drastic changes that happen within their families due to chronic or acute illness, treatment, and recovery."  See Child Life Specialist, Mayo Clinic (Jan. 21, 2014), http://www.mayo.edu/mshs /careers/child-life-specialist.

Burbage used pictures of the digestive system and a preoperative teaching book to show D.F. what the surgeon would be doing.[3]  She also provided D.F. with "diagnosis education using written materials from kidshealth.org" and gave him an ostomy doll.  D.F. eventually had surgery, and the procedure was successful.  On April 17, 2009, D.F. was discharged from the hospital, though he returned in December 2009 for a follow-up procedure.

While D.F. was a patient at Arnold Palmer in April 2009, he was given a writing board to help him communicate, and the staff also often relied on his parents to help interpret for him.  However, none of the staff members ever directly offered D.F. or his parents interpretive services.  At some point McCullum told the doctors and nurses that D.F. could read, but she also said that he preferred to communicate through sign language.  Still, neither D.F. nor his parents ever asked the hospital staff to provide a sign language interpreter.  Toward the end of D.F.'s stay, his mother told some nurses that she did not "know a lot of sign language" when they asked her to find out whether D.F. was experiencing any pain; however, there is no evidence that the nurses continued to rely on D.F.'s mother to interpret for him after she told them that her sign language abilities were limited.

---

[3] D.F. later testified that the book was "very large" and that he understood only a small part of it.  But there is no evidence that he indicated to Burbage or anyone else at that time that he did not understand all of it.

Since D.F.'s surgery, Dr. Devandra Mehta — D.F.'s attending physician at Arnold Palmer — has continued to monitor D.F.'s progress through outpatient appointments at Arnold Palmer's medical campus. Dr. Mehta currently provides D.F. with an interpreter for those office visits. The doctor has stated that D.F. is "doing well" in his recovery and that the surgery resulted in a "very good outcome." As a result, with the help of over-the-counter medication, D.F. is able to control his symptoms. He has not been hospitalized at either Parrish or Arnold Palmer since his two operations in 2009.

## II.

More than two years after D.F.'s initial hospitalization, his parents filed a complaint in federal court, individually and on behalf of D.F. and his sister, alleging violations of their rights under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12132 & 12182, and the Rehabilitation Act of 1973 (RA), 29 U.S.C. § 706.[4] They sought compensatory damages for disability discrimination, as well as declaratory relief and an injunction to stop the defendants from denying D.F. equal access to their services in the future. The district court dismissed with prejudice the claims of the parents and the sister, concluding that they had not suffered cognizable injuries under either statute. The claims brought on D.F.'s

---

[4] North Brevard County Hospital District, which operates the Parrish hospital, and Orlando Regional Healthcare Systems, Inc., which operates the Arnold Palmer hospital, were named as the defendants.

8

behalf survived the defendants' motions to dismiss but not their motions for summary judgment. The district court granted summary judgment to the defendants on D.F.'s ADA and RA claims insofar as they sought injunctive relief because the parents had failed to create a genuine issue that D.F. was likely to return to either hospital in the near future. The court also granted summary judgment on D.F.'s ADA and RA claims insofar as they sought damages because the parents had not created a genuine issue that the defendants had been deliberately indifferent to D.F.'s rights under the ADA and RA.

D.F.'s parents brought this appeal, raising three issues for our review. First, they contend that the district court erred when it determined that they and D.F.'s sister did not have standing to assert claims for associational discrimination under the ADA and RA. Second, they contend that the district court incorrectly concluded that D.F. lacked standing to seek injunctive relief because the threat of future harm was too speculative. Third, they assert that they demonstrated there was a genuine issue of material fact about whether the defendants had been deliberately indifferent to D.F.'s rights under the ADA and RA.

### III.

When a district court dismisses a plaintiff's claim for lack of standing, we review <u>de novo</u> the court's legal conclusions, and we review its factual findings for clear error. <u>ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.</u>, 557 F.3d 1177,

1190, 1195 (11th Cir. 2009); Stalley ex rel. United States v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008). We review de novo a district court's grant of summary judgment, viewing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in favor of that party as well. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. We may uphold the district court's grant of summary judgment on any basis supported by the record. Id.

## A.

The district court determined that D.F.'s parents and sister lacked statutory standing to assert claims of their own under the RA and ADA because they had not alleged that they were personally excluded or denied benefits on the basis of D.F.'s disability. Relying on the Second Circuit's decision in Loeffler v. Staten Island University Hospital, 582 F.3d 268 (2d Cir. 2009), D.F.'s parents contend that the district court interpreted the RA and ADA too narrowly when it held that non-disabled individuals allege cognizable injuries under those statutes only when they claim to have been personally excluded, discriminated against, or denied benefits on the basis of someone else's disability. They assert that both statutes grant standing more broadly to persons who suffer any "independent injury" because of

10

their association with a disabled individual.  They claim that they and D.F.'s sister suffered an injury independent from D.F.'s injury when Parrish and Arnold Palmer relied on them to help communicate with D.F.[5]

It is widely accepted that under both the RA and the ADA, non-disabled individuals have standing to bring claims when they are injured because of their association with a disabled person.  See Addiction Specialists, Inc. v. Twp. of Hampton, 411 F.3d 399, 405–09 (3d Cir. 2005) (addressing standing of non-disabled party under both the ADA and RA); MX Grp., Inc. v. City of Covington, 293 F.3d 326, 333–35 (6th Cir. 2002) (same); Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 46–48 (2d Cir. 1997) (same); see also A Helping Hand, LLC v. Baltimore Cnty., 515 F.3d 356, 362–64 (4th Cir. 2008) (addressing standing of non-disabled party under the ADA); Weber v. Cranston Sch. Comm., 212 F.3d 41, 47–49 (1st Cir. 2000) (addressing standing of non-disabled party under the RA).

---

[5] D.F.'s parents further allege that they were injured because the defendants relied on them to provide interpretive services in violation of 28 C.F.R. § 36.303(c)(3).  See 28 C.F.R. § 36.303(c)(3) (stating that "[a] public accommodation shall not rely on an adult accompanying an individual with a disability to interpret or facilitate communication" except in certain circumstances).  A violation of that regulation cannot serve as a basis for their claim, however, because the regulation had not been enacted at the time of D.F.'s hospitalization in 2009.  See Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 75 Fed. Reg. 56,236–37, 56,253–54 (Sept. 15, 2010).  As a result, we have no occasion to decide whether a plaintiff may assert a cause of action premised on a violation of § 36.303(c)(3).

The section of the ADA conferring standing on a non-disabled party states that "[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E). On its face § 12182(b)(1)(E) recognizes only certain kinds of injuries that may form the basis of an ADA suit brought by a non-disabled individual. The text makes clear that a non-disabled individual has standing to bring suit under the ADA only if she was personally discriminated against or denied some benefit because of her association with a disabled person. See id.; A Helping Hand, LLC, 515 F.3d at 358–59, 363–64 (holding that the operator of a methadone clinic had standing to challenge a zoning ordinance that was enacted to make it unlawful for the clinic to operate at its chosen location); MX Grp., Inc., 293 F.3d at 329–31, 333–35 (holding that a drug treatment provider had standing to challenge the city's denial of a zoning permit, which prevented the provider from opening a methadone clinic in the city). That much is clear.

The scope of the RA provision granting standing to non-disabled persons is less clear. The relevant section of the statute provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 . . . shall be available to any person aggrieved by any act or failure to act by any" entity

subject to the RA.  See 29 U.S.C. § 794a(a)(2) (emphasis added).  As we have noted, "the Supreme Court and this Court have said on numerous occasions, 'any' is a powerful and broad word.  It does not mean some or all but a few, but instead means all."  United States v. Fleet, 498 F.3d 1225, 1229 (11th Cir. 2007).  But the Supreme Court has also said that "broad language is not limitless" and "a liberal construction nonetheless can find limits in a text's language, context, history, and purposes."  Watson v. Philip Morris Cos., 551 U.S. 142, 147, 127 S.Ct. 2301, 2305 (2007).

The statutory context does limit the scope of § 794a(a)(2).  It shows that the RA was meant to ensure that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by the statute.  29 U.S.C. § 794(a) (emphasis added).  That proscribed conduct is what the statute makes unlawful, and a party is "aggrieved" within the meaning of § 794a(a)(2) only if she suffers injury because she was subject to one of those types of conduct.  See Roberts v. Sea-Land Servs., Inc., — U.S. —, 132 S. Ct. 1350, 1357 (2012) ("Statutory language . . . cannot be construed in a vacuum.") (quotation marks omitted); FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133, 120 S.Ct. 1291, 1301 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be

13

read in their context and with a view to their place in the overall statutory scheme.") (quotation marks omitted); Edison v. Douberly, 604 F.3d 1307, 1310 (11th Cir. 2010) ("We too have long recognized that our authority to interpret statutory language is constrained by the plain meaning of the statutory language in the context of the entire statute, as assisted by the canons of statutory construction."). Therefore, the threshold for associational standing under both the RA and the ADA is the same:  non-disabled persons have standing to seek relief under either statute only if they allege that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person.

This interpretation complies with the ADA's express directive that we must not construe that statute to apply a lesser standard than the standards that apply under the RA.  See 42 U.S.C. § 12201(a) ("Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 . . . ."). If we held that § 794a(a)(2), the associational standing provision of the RA, covered injuries beyond the exclusion, denial of benefits, or discrimination that a plaintiff personally suffers, the RA would impose a higher standard than the ADA associational standing provision does.  The ADA's associational standard extends only to those who have personally suffered exclusion, denial of benefits, or

14

discrimination because of their association with someone who is disabled.  42 U.S.C. § 12182(b)(1)(E) ("It shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association.") (emphasis added).

We reject the contention that non-disabled individuals may seek relief under the RA and ADA for injuries other than exclusion, denial of benefits, or discrimination that they themselves suffer.  If that contention were correct, it would mean that Congress granted non-disabled persons more rights under the ADA and RA than it granted to disabled persons, who can recover only if they are personally excluded, denied benefits, or discriminated against on the basis of their disability.  See 29 U.S.C. § 794(a); 42 U.S.C. § 12182.  That cannot be right given that Congress enacted both laws to promote the rights of the disabled.  See Rehabilitation Act of 1973, Pub. L. No. 93-112, § 2, 87 Stat. 355, 357 (explaining Congress' purpose in enacting the RA); Americans with Disabilities Act of 1990, Pub. L. No. 101-336, § 2(b), 104 Stat. 327, 329 (explaining Congress' purpose in enacting the ADA); see also Loeffler, 582 F.3d at 287 (Jacobs, C.J., dissenting) (rejecting an expansive interpretation of standing under the RA that would "grant more extensive remedies to associated persons than to persons with disabilities"

because "only the disabled would actually have to be excluded, denied, or subjected to discrimination in order to recover damages").

We are not persuaded by the Second Circuit's Loeffler decision and its broad interpretation of standing under the RA. In Loeffler, the Second Circuit held that non-disabled plaintiffs were aggrieved within the meaning of § 794a(a)(2) so long as they could show "an independent injury causally related to the denial of federally required services to the disabled persons with whom [they] are associated." 582 F.3d at 279 (Wesley, J. concurring).[6] The Second Circuit rejected the idea that the class of cognizable injuries under the RA was limited to exclusion, denial of benefits, or discrimination. Id. at 280. It did so because "[t]he standing provision of the RA . . . is distinct from the provision prohibiting discriminatory conduct," and prior Second Circuit precedent indicated that associational standing under the RA should be interpreted "as broadly as possible under the Constitution, irrespective of § 794(a)." Id. The Second Circuit also concluded that, even if the non-disabled plaintiffs in that case had been required to show that they were personally denied benefits, they had made that showing because "they were denied the benefits of adequate sign language interpretation

---

[6] This is the Second Circuit's holding on the RA associational standing issue, even though it is expressed in a concurring opinion. See Loeffler, 582 F.3d at 279 (Wesley, J. concurring) ("I write to express the view of two members of the panel with regard to the children's claims under the Rehabilitation Act of 1973 (the 'RA')."); id. at 277 ("The opinion of Judge Wesley constitutes the opinion of the Court as to this issue."). Because it is the court's majority opinion on that issue, we will skip the traditional citation convention of citing it as a concurring opinion every time we mention it here.

16

services" when the hospital where their father was receiving treatment ignored their repeated requests to provide him with an interpreter.  Id.

We disagree with Loeffler's reasoning.  As we have explained, the statutory context of the RA indicates that a party is "aggrieved" within the meaning of § 794a(a)(2) only if she is personally excluded, denied benefits, or discriminated against because of her association with a disabled person.  The associational standing provision of the RA should not be interpreted "irrespective of § 794(a)," the provision that prohibits discrimination against disabled people.  See Loeffler, 582 F.3d at 280.  We also disagree with the Second Circuit's conclusion that non-disabled persons are denied benefits when a hospital relies on them to help interpret for a deaf patient.  Although disabled persons are entitled to appropriate benefits in the form of accommodations, see 28 C.F.R. § 35.160(b)(1), the relevant federal regulations in effect at the time of D.F.'s hospitalization did not confer any corresponding benefit on non-disabled persons.

Beyond its reasoning, Loeffler's extreme facts distinguish it from this case. In that case the plaintiffs repeatedly asked hospital officials to provide a sign language interpreter for their deaf father, but those requests were persistently ignored or "laughed off."  582 F.3d at 271, 273, 276.  Instead, the hospital conscripted the 17-year-old and 13-year-old plaintiffs to serve as interpreters, going so far as to give one of the children a pager so she could be "on call," and

17

causing both children to miss more than a week of school. Id. at 272–73. Here, the Parrish and Arnold Palmer hospitals did not ignore, reject, or laugh off any requests for an interpreter. It is undisputed that D.F. and his family members never requested one. D.F.'s parents and his sister have also failed to identify any evidence indicating that they missed either work or school because they were at the hospital interpreting for D.F.

There are not even any allegations that Parrish or Arnold Palmer hospitals excluded, denied benefits to, or discriminated against the parents or sister because of their association with D.F. As a result they lack standing to sue under the RA and ADA, and the district court properly dismissed their claims. See Lexmark Int'l, Inc. v. Static Control Components, Inc., — U.S. —, 134 S.Ct. 1377, 1387 (2014) (noting that a plaintiff lacks statutory standing if, under a proper construction of the statute at issue, her claim does not fall within the cause of action created by the statute).

## B.

D.F. contends that the district court erred when it found that his claims seeking injunctive relief were too speculative and granted the defendants summary judgment on those claims.[7] He contends that he suffers from a "chronic medical

---

[7] The claims of D.F. that we discuss in the remainder of this opinion are claims that his parents brought on his behalf. For clarity we refer to them simply as his claims and describe the parents' assertions and arguments on his behalf as his own.

18

condition" from which he "continues to experience complications." As a result, he asserts, he is likely to return to the Parrish and Arnold Palmer hospitals for treatment and suffer the same alleged denial of benefits or discrimination that he experienced during his initial hospitalizations there.

At the summary judgment stage, a plaintiff must come forward with evidence showing the following in order to have Article III standing: (1) an injury in fact that is concrete, particularized, and either actual or imminent; (2) a causal connection between the injury and the conduct complained of; and (3) a likelihood that a favorable judicial decision will redress the injury. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136–37 (1992). A plaintiff has standing to assert a claim for injunctive relief only when the threatened harm is real and immediate, not conjectural or hypothetical. Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001) ("In addition, '[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges . . . a real and immediate — as opposed to a merely conjectural or hypothetical — threat of future injury.'") (alterations in original) (quoting Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1284 (11th Cir. 2001)).

For two reasons, the district court was correct to grant the defendants summary judgment on D.F.'s claims seeking injunctive relief. First, the parents failed to present evidence showing that there was a real and immediate threat that

19

D.F. would be hospitalized again at either of the two hospitals.  See Shotz, 256 F.3d at 1081.  Although D.F. asserts that ulcerative colitis is a chronic condition, he does not point to any medical evidence in support of that claim.  Dr. Mehta testified that during D.F.'s initial hospitalization doctors removed his colon, which was "the organ [causing] the problem" for D.F.  He also testified that D.F. is currently "doing well" and had achieved a "very good outcome" in the time since his surgery.   Dr. Mehta indicated that D.F. can now control his symptoms with the help of over-the-counter medication.  Finally, it is undisputed that between the time of D.F.'s December 2009 surgery and the time the appellees' briefs were filed in this appeal in October 2013, D.F. has not been hospitalized.  Even viewing all of the evidence in D.F.'s favor, he has failed to establish a real and immediate threat that he will be readmitted to either Parrish or Arnold Palmer.

And even if we assume that D.F. will be hospitalized again at Parrish or Arnold Palmer hospital, there is no evidence indicating that he will likely experience a denial of benefits or discrimination at either facility.  As mentioned earlier, both hospitals have written policies stating that they will provide appropriate accommodations for hearing-impaired patients, which may include the use of a hospital-provided interpreter.  Dr. Mehta also currently ensures that D.F. has a sign language interpreter present for his outpatient appointments on Arnold Palmer's medical campus.  Now that both hospitals know that D.F. wants an

20

interpreter to help him communicate and D.F.'s parents know that all they have to do is request one, there is little or no chance that either hospital will refuse to provide D.F. with an interpreter if he is readmitted.  Therefore there is no real and immediate threat of future injury, and the district court properly concluded that D.F. lacked standing to seek injunctive relief.  See Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1334 (11th Cir. 2013); Shotz, 256 F.3d at 1081.

## C.

Finally, D.F. argues that the district court erred in granting the defendants summary judgment on his claims seeking compensatory damages because a reasonable jury could have found that the defendants were deliberately indifferent to his rights under the RA and ADA.  He asserts that a reasonable jury could find deliberate indifference based on the fact that the staff (including doctors) at Parrish and Arnold Palmer hospitals knew that he was deaf, they had the authority to get a sign language interpreter for him, and they failed to do so.  He argues that the fact he was deaf made his need for an interpreter obvious.

Under regulations in effect at the time of D.F.'s hospitalization, the defendants were required to "furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of," their treatment programs.  28 C.F.R. § 35.160(b)(1) (emphasis added).  The regulations now provide that "[t]he type of

21

auxiliary aid or service necessary to ensure effective communication will vary in accordance with the method of communication used by the individual; the nature, length, and complexity of the communication involved; and the context in which the communication is taking place." 20 C.F.R. § 35.160(b)(2) (2011). In determining what the appropriate auxiliary aids are, hospitals must "give primary consideration to the requests of individuals with disabilities." Id. § 35.160(b)(2) (emphasis added).

To prevail on a claim for compensatory damages under either the RA or the ADA, a plaintiff must show that a defendant violated his rights under the statutes and did so with discriminatory intent.[8] Liese v. Indian River Cnty. Hosp. Dist., 701 F.3d 334, 342 (11th Cir. 2012) (noting that a plaintiff seeking compensatory damages under the RA must show that his rights were violated "with discriminatory intent"); Delano-Pyle v. Victoria Cnty., 302 F.3d 567, 574 (5th Cir. 2002) ("A plaintiff asserting a private cause of action for violations of the ADA or the RA may only recover compensatory damages upon a showing of intentional

---

[8] Where a plaintiff is not seeking compensatory damages, discriminatory intent is not required. In that situation, a showing that the auxiliary aids he received to assist him in communicating were not sufficient to provide him with an equal opportunity to benefit from the healthcare provider's treatment is enough by itself to establish a violation of both the RA and ADA. See Liese, 701 F.3d at 343–44. And in this case, there is a genuine issue of material fact about whether D.F. was provided with effective accommodations. That does not, however, rule out summary judgment for the defendants on the compensatory damages claim because D.F. must also establish a genuine issue of material fact that they acted, or failed to act, with discriminatory intent. See Liese, 701 F.3d at 342.

discrimination."); Duvall v. Cnty. of Kitsap, 260 F.3d 1124, 1138 (9th Cir. 2001) ("To recover monetary damages under Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination on the part of the defendant.") (footnote omitted). A plaintiff may prove discriminatory intent by showing that a defendant was deliberately indifferent to his statutory rights. Liese, 701 F.3d at 345 ("[A] plaintiff may demonstrate discriminatory intent through a showing of deliberate indifference."). That is an "exacting standard," Doe v. Sch. Bd. of Broward Cnty., 604 F.3d 1248, 1259 (11th Cir. 2010), which requires showing more than gross negligence, Liese, 701 F.3d at 344. To establish deliberate indifference, a plaintiff must show that the defendant "knew that harm to a federally protected right was substantially likely" and "failed to act on that likelihood." Liese, 701 F.3d at 344 (quotation marks omitted). Where the substantial likelihood of harm is obvious, a jury may infer that the defendant had actual knowledge of that substantial risk of harm. See Farmer v. Brennan, 511 U.S. 825, 842, 114 S.Ct. 1970, 1981 (1994) ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was 'obvious.'") (citation omitted); see also Robertson v. Las Animas Cnty. Sheriff's Dep't, 500 F.3d 1185, 1197 (10th Cir. 2007) ("That is,

23

the entity will know of the individual's need for an accommodation because it is obvious.").

That means, in this case, that the failure of Parrish and Arnold Palmer to provide D.F. with an interpreter is not enough to support a finding of deliberate indifference. See Liese, 701 F.3d at 343 ("[T]he simple failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights under the RA."). The regulations do not require healthcare providers to supply any and all auxiliary aids even if they are desired and demanded. See id. (noting that "construing the regulations in this manner would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid"). Or, as in this case, not demanded. To prevail, D.F. must show that the defendants knew there was a substantial likelihood that they would be unable to communicate effectively with him absent an interpreter but still made a "deliberate choice" not to provide one. See id. at 344. He has failed to make that showing.

### 1.

First, D.F. has failed to create a genuine issue of material fact about whether the Parrish staff acted with deliberate indifference. The evidence showed that Parrish provided several accommodations to facilitate communication between D.F. and the hospital staff. One nurse who knew some sign language communicated with D.F. by signing. Other staff members relied on written notes

24

and printed handouts to help D.F. understand the different aspects of his treatment. Many of the staff members also communicated with D.F. through his parents and sister.

D.F. has not presented enough evidence to create a genuine issue of material fact about whether the staff at Parrish Hospital:  (1) knew it was substantially likely that the accommodations they provided were ineffective and (2) were aware that an interpreter was required for them to effectively communicate with D.F. but made a "deliberate choice" not to provide one.[9]  D.F.'s attending physician testified that he believed he was effectively communicating with D.F., and D.F.'s medical records stated that the nurses observed him "nod[ding] understanding" or "verbaliz[ing] understanding" when they spoke to him.  There is no evidence that D.F. or his family members did anything to disabuse the Parrish staff of their allegedly mistaken belief that the staff was communicating effectively with him. D.F.'s mother told the staff that she knew some sign language, but there is no evidence that she told the staff at that time that her knowledge was inadequate or

_____

[9] To prevail on D.F.'s claims seeking damages from the hospitals, the parents must also show deliberate indifference on the part of "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the organization's behalf and who has actual knowledge of discrimination in the organization's programs and fails to adequately respond."  See Liese, 701 F.3d at 349 (alterations omitted); see also Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 290, 118 S.Ct. 1989, 1999 (1998).  Because we conclude that D.F. has not presented sufficient evidence of deliberate indifference by any Parrish or Arnold Palmer staff member, we need not address whether the nurses and doctors treating him qualified as "officials" within the meaning of Liese and Gebser.

that she felt unqualified to interpret for her son.  Nor is there any evidence that D.F. or his family members ever requested an interpreter or that his family members told the staff that they were struggling to translate the doctors' and nurses' questions and statements for their son.  Finally, there is no evidence suggesting that the staff's written notes were ineffective as auxiliary aids or, assuming that they were, that the nurses and doctors at Parrish knew that fact.  Because there is no evidence to support a conclusion that the Parrish staff knew that their accommodations were ineffective in enabling D.F. to communicate with his nurses and doctors, a reasonable jury could not find that the Parrish staff acted with deliberate indifference.

2.

Second, D.F. has also failed to create a genuine issue of material fact about whether the Arnold Palmer Hospital staff acted with deliberate indifference.  As we have discussed, it relied on several auxiliary aids to communicate with D.F.  For instance, one of its staff members used pictures, written materials, and a doll to help him learn about his treatment.  Other staff members communicated with him by using his parents to help translate.  The hospital also provided D.F. with a writing board next to his bed so he and the staff could write messages to each other.

26

D.F. has not presented enough evidence to create a genuine issue of material fact about whether the staff at Arnold Palmer Hospital knew it was substantially likely that the accommodations that were provided were ineffective. Although the hospital had posted signs stating that interpretation services were available to patients who had communication difficulties, neither D.F. nor his family members asked the hospital to provide those services. And although D.F. testified that he had a hard time understanding the book he had been given so that he could learn more about his surgery, there is no evidence that he or his family did anything to let the Arnold Palmer staff know that. Finally, although the hospital staff did communicate with D.F. through writing, it did so only after his mother told them that he could read.

The mother's testimony that she told some unspecified nurses she did not "know a lot of sign language" is the plaintiffs' best evidence that the Arnold Palmer staff knew it was substantially likely that the accommodations D.F. was receiving were insufficient. But the mother waited until the end of D.F.'s 11-day hospitalization to let those nurses know that her sign language ability was limited, and she has not presented any evidence that the nurses or any other staff members continued relying on her as an interpreter afterward. Simply stated, D.F.'s parents have not presented sufficient evidence to create a genuine issue of material fact

27

about whether the staff at Arnold Palmer Hospital knew it was substantially likely that the accommodations they were providing were ineffective.

### 3.

The circumstances in this case are in stark contrast to the facts in other cases where courts have found sufficient evidence to avoid summary judgment on deliberate indifference. For example, we concluded in Liese that there was enough evidence to find deliberate indifference where a deaf patient (1) told her doctor on two occasions that she needed an interpreter and was ignored, (2) told her doctor that her ability to read lips was limited and was "laughed at" by him, and (3) repeatedly asked her doctor why she needed to have her gallbladder removed after her doctor simply wrote her a note stating, "remove it and you'll feel better." 701 F.3d at 351. Similarly, in Loeffler the Second Circuit held that there was sufficient evidence for a reasonable jury to find deliberate indifference where numerous requests for an interpreter and other accommodations were ignored by hospital officials and one demand for an interpreter was "laughed off" by the patient's doctor. 582 F.3d at 276–77.

### IV.

For the reasons discussed, we affirm the district court's order dismissing the associational claims brought by D.F.'s parents individually and on behalf of D.F.'s

28

sister.  We also affirm the district court's grant of summary judgment in favor of the defendants on the claims brought on D.F.'s behalf.

**AFFIRMED.**