[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-12771

_____

D.C. Docket No. 6:12-cv-01268-GAP-DAB


RICHARD MARTIN,
JOHN D'AMBROSIO,
YOLANDA GERVARZES,

Plaintiffs-Appellants,

versus

HALIFAX HEALTHCARE SYSTEMS, INC.,
HALIFAX COMMUNITY HEALTH SYSTEMS,
a Special Taxing District,
d.b.a. Halifax Hospital Medical Center,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 31, 2015)

Before JORDAN, JULIE CARNES, and LINN,[*] Circuit Judges.

JULIE CARNES, Circuit Judge:

Plaintiffs Richard Martin, John D'Ambrosio, and Yolanda Gervarzes (collectively, "Plaintiffs") appeal the district court's order granting summary judgment to Defendants on their disability discrimination claims arising under the Americans with Disabilities Act (the "ADA") and the Rehabilitation Act of 1973 (the "Rehab Act").[1] The district court held that there was no evidence from which a reasonable jury might conclude that Plaintiffs were excluded from participating in, or denied the benefit of, the services Defendants provided, or otherwise discriminated against. After a careful review of the record, and with the benefit of oral argument, we affirm.

## BACKGROUND

### I.    Factual Background

Defendants Halifax Healthcare Systems, Inc. and Halifax Community Health Systems own and operate Halifax Hospital Medical Center ("Halifax Hospital" or "the hospital"). The three plaintiffs are deaf individuals who communicate primarily through the use of American Sign Language ("ASL") and

---

[*] Honorable Richard Linn, United States Circuit Judge for the Federal Circuit, sitting by designation.

[1] The district court also granted summary judgment on claims asserted by Plaintiffs under the Florida Civil Rights Act of 1992. Plaintiffs do not specifically challenge on appeal or offer any arguments concerning the district court's ruling on claims made under this statute.

2

who either were treated or were present with a family member who was treated at Halifax Hospital in the summer of 2011.  Plaintiffs claim that they requested live ASL interpreting services at some point during their interaction with the hospital staff.  And, as described in more detail below, the hospital did provide several hours of live interpreting services to Plaintiffs D'Ambrosio and Gervarzes, and communicated with all three plaintiffs via written notes.  However, the hospital did not provide continuous live interpreting services to D'Ambrosio or Gervarzes throughout the duration of their stay at the hospital, nor did the hospital make a live interpreter available to Plaintiff Martin during his brief emergency room visit.  Because the hospital failed to do so, Plaintiffs initiated the present litigation.  We set out, individually, the facts underlying each plaintiff's claim.

### A.    John D'Ambrosio

Accompanied by girlfriend Sandra Hill, who is also deaf, D'Ambrosio was rushed to the hospital on June 23, 2011, after suffering a major heart attack.  Dr. Kirby Haws, one of D'Ambrosio's treating physicians, testified that D'Ambrosio's condition upon arrival at the hospital was life threatening.  Recognizing that they needed to act fast to save D'Ambrosio's life, the medical staff quickly determined that D'Ambrosio needed an emergency cardiac catheterization, which procedure was soon thereafter performed by Dr. Vance Wilson.

D'Ambrosio and his girlfriend had both requested a live ASL interpreter

3

immediately upon their arrival at the hospital.  And, in fact, hospital staff contacted SLS Interpreting Services to request an interpreter, informing D'Ambrosio that a live interpreter was on the way.  But once it was determined that D'Ambrosio needed an immediate, emergency cardiac catheterization, staff canceled the request for an interpreter.

As to the time spent with D'Ambrosio before the catheterization, Dr. Haws and Dr. Wilson testified that they were able to communicate effectively with him, notwithstanding the absence of a live interpreter.  Dr. Haws stated that he used the "LifeLinks" video remote interpreting ("LifeLinks") system to advise D'Ambrosio about his condition and the catheterization procedure and that he communicated with D'Ambrosio's girlfriend through a combination of lip-reading, gestures, and written notes.[2]  Dr. Haws did not recall D'Ambrosio requesting a live interpreter prior to the procedure, and he did not believe that a live interpreter was necessary.

Dr. Wilson similarly indicated in his written report that he used a "translator" in the catheterization lab to inform D'Ambrosio that he was "having a heart attack and that we were going to have to open up his heart artery with a catheter."  Dr. Wilson did not write notes to D'Ambrosio prior to or during the procedure due to the need to keep the catheterization lab sterile.  Nonetheless, Dr. Wilson did use hand gestures to let D'Ambrosio know that he was okay and to

_____

[2] LifeLinks is an interpreting service that provides access to a live ASL interpreter on a video screen.

4

remind him that he needed to be still during the procedure.  Dr. Wilson testified that D'Ambrosio appeared to understand his communications.  In any event, as Dr. Wilson explained, prior to an emergency catheterization, there is limited opportunity to communicate with any patient, regardless of whether or not the patient can hear.  Indeed, due to the urgency of the procedure, a doctor's communication to the patient generally consists of little more than informing the patient that he is having a heart attack and that a catheterization procedure needs to be done immediately.

D'Ambrosio acknowledges that Dr. Wilson attempted to communicate with him through the LifeLinks system immediately before the catheterization procedure.  In fact, in the summary judgment response that Plaintiffs filed in the district court, D'Ambrosio indicated that Dr. Wilson actually did communicate with him via LifeLinks prior to the procedure.  Yet, in a subsequent motion to reconsider submitted after the entry of summary judgment, and now on appeal, D'Ambrosio claimed that the LifeLinks system was inoperable.  As a result, D'Ambrosio contends that, having no understanding of his condition or what the catheterization would entail, he was distressed because he was in pain throughout the procedure.

After the procedure, D'Ambrosio was placed in the ICU and visited there by Dr. Wilson, who communicated with him by writing notes.  Dr. Wilson testified

that, through these notes, he was able to convey that the procedure was successful, that D'Ambrosio would be okay, and that Wilson would come back the next day to discuss follow-up and prognosis.  The documentary evidence, which includes Dr. Wilson's written notes, confirms Dr. Wilson's testimony.  Moreover, it is undisputed that D'Ambrosio can read and write English.  D'Ambrosio nevertheless claims that he did not understand the information provided to him by Dr. Wilson in the ICU.

D'Ambrosio was hospitalized at Halifax Hospital from June 23, 2011 through June 28, 2011.  D'Ambrosio testified that he repeatedly requested a live ASL interpreter during his hospitalization, but that while an interpreter was present some of the time, during the majority of the time there was no live interpreter. According to D'Ambrosio, the hospital staff tried to communicate with him through friends and family, written notes, and gestures, but he was unable to understand any of the information the staff attempted to provide.  Again, however, written notes in the record confirm that Dr. Wilson and other staff provided detailed written information to D'Ambrosio concerning his condition, treatment, and prognosis, including a graphic depiction of the cardiac catheterization procedure.

Undisputed documentary evidence also shows that the hospital provided webcam interpreting services to D'Ambrosio on June 24th, and a live interpreter to

6

D'Ambrosio for two hours on June 26th, four hours on June 27th, and two hours on June 28th.  Further, D'Ambrosio, who testified that he regularly texted when communicating with hearing and deaf individuals in other contexts, acknowledged that he had his laptop during most of his hospital stay and that he could have used it to communicate with hospital staff by typing written notes, but he simply chose not to do so.[3]

After his hospitalization, D'Ambrosio continued to be treated by Dr. Wilson, until Dr. Wilson terminated the relationship due to D'Ambrosio's refusal to comply with his order that he stop smoking.  An ASL interpreter was present at each of D'Ambrosio's follow-up visits with Dr. Wilson.

### B.    Yolanda Gervarzes

Gervarzes accompanied her seventeen-year old daughter, Angelique Martin, to the hospital on August 2, 2011 when Martin manifested pre-term labor symptoms.  Upon arrival at 9:00 p.m., Gervarzes requested a live ASL interpreter.  Gervarzes was not a newcomer to the hospital, having been there many times before and having received live interpreting services on at least 48 prior occasions when she had been seen as a patient.  This time, though, the staff first attempted to use the LifeLinks system to communicate with her, instead of obtaining a live

---

[3]  D'Ambrosio also had access to an ASL translating service on his laptop, but, crediting D'Ambrosio's testimony, we assume that he was prohibited by his service agreement from using the translating service to converse with people in the same room as him, and so he could not use the service to communicate with hospital staff.

interpreter.

Nurse Laperriere, who spoke with Gervarzes upon her daughter's admission to the hospital, testified that she had used LifeLinks without any problems in the past, but Gervarzes nonetheless refused to use the service.   Laperriere then contacted Nurse Pollock, the supervising nurse on duty at the time, about obtaining a live interpreter for Gervarzes.  Pollock testified that when he encountered Gervarzes, she was angry and shaking an ADA flyer in an "animated" manner. Even though the LifeLinks system had been set up and was ready for use by Gervarzes, Pollock acceded to Gervarzes' demand and immediately arranged for a live interpreter to come to the hospital instead.  Pollock placed no restrictions on the time the interpreter could remain there.

Gervarzes' daughter gave birth to a healthy baby boy at 5:40 p.m. on August 4, and was discharged on August 6.  During her stay, the hospital provided live interpreting services to her mother, Plaintiff Gervarzes, from 11:30 p.m. until 1:30 a.m. on August 2-3, and from 9:30 a.m. until 12:30 p.m. on August 3.  When no interpreter was present, hospital staff was able to communicate with Gervarzes via her daughter, who was not deaf, and by writing notes.

## C.    Richard Martin

Martin was treated in the hospital's emergency room for a minor head injury that he suffered when he fell out of his motorized scooter while shopping on

8

August 17, 2011. While he was in the ER, Martin was examined and his vital signs were taken. Martin had a CT scan of his brain and x-rays of his cervical spine and shoulder, the results of which were normal.

Dr. Kocisko, who attended to Martin during his ER visit, testified that Martin never requested a live interpreter,[4] and Kocisko did not believe a live interpreter was necessary. Dr. Kocisko wrote notes to communicate with Martin, who appeared to understand all the information that was conveyed to him. Martin received typed instructions upon discharge, and it is undisputed that he could read and write English. As Martin was only in the emergency room for about two hours before he was discharged, the above constitutes the extent of his interaction with hospital staff on this particular occasion. Further, it is undisputed that the hospital had provided live interpreting services to Martin on at least 42 prior occasions.

## II.    Procedural History

Plaintiffs filed their complaint in August, 2012, asserting claims against Defendants under Title II and Title III of the ADA, § 504 of the Rehab Act, and the

---

[4] Plaintiffs claimed in their brief in opposition to summary judgment, as they claim in their appellate brief, that Martin requested an interpreter upon his arrival at the hospital and numerous times thereafter, but no interpreter was provided. Yet, Plaintiffs cited no evidence in support of that claim in any of the materials they filed in the district court. Likewise, Plaintiffs cite no supporting evidence for this assertion on appeal. *See Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) ("For factual issues to be considered genuine, they must have a real basis in the record.") (citation and quotation marks omitted); *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997) ("to oppose [a] properly supported motion for summary judgment, [the plaintiff] must come forward with specific factual evidence, presenting more than mere allegations").

9

Florida Civil Rights Act.  In their complaint, Plaintiffs alleged that the above statutes require that deaf individuals have an equal opportunity to participate in and enjoy the benefits of the hospital's services, and that Defendants failed to meet the obligations imposed on them by these laws.  Plaintiffs sought both compensatory damages and injunctive relief.

Defendants moved for summary judgment.  Plaintiffs filed a timely response.  Yet, while Gervarzes, D'Ambrosio, and D'Ambrosio's girlfriend submitted declarations, and Martin submitted a set of interrogatory responses, in opposition to summary judgment, Plaintiffs neither submitted nor referenced any of their own deposition testimony.  Thereafter, Defendants filed their reply.  It was only then, about a month after filing their response, that Plaintiffs sought leave to supplement the record by designating additional evidence, primarily the complete transcript of each Plaintiff's deposition.

The district court denied Plaintiff's motion to supplement, and granted summary judgment to Defendants.  Plaintiffs moved for reconsideration of the summary judgment order, but attached only D'Ambrosio's deposition transcript as an exhibit, and not the deposition transcripts of Martin and Gervarzes.  Defendants filed a motion to strike the deposition transcript, which the district court granted in conjunction with its order denying reconsideration.

On appeal, Plaintiffs contend that there is sufficient evidence in the record to

10

withstand Defendants' motion for summary judgment.  According to Plaintiffs, the hospital's failure to provide live interpreters during the entirety of their stay creates a triable issue as to whether the hospital failed to provide appropriate auxiliary aids necessary to ensure effective communication, as required by the ADA and the Rehab Act.  Related to this contention, Plaintiffs also argue that the district court erred in denying their motion to reconsider, meaning that the court should have considered D'Ambrosio's deposition testimony in ruling on the summary judgment motion.

## DISCUSSION

### I.    <u>Motions to Supplement and Reconsider</u>

In support of their motion for summary judgment, Defendants cited documentary evidence and testimony, including excerpts from the depositions of D'Ambrosio and Martin.  In their response, however, Plaintiffs cited to no deposition testimony.  Instead, the only evidence Plaintiffs submitted in response to Defendants' motion was a set of interrogatory responses from Martin establishing that he is deaf and primarily uses ASL to communicate, and declarations from Gervarzes, D'Ambrosio, and D'Ambrosio's girlfriend summarily stating that (1) they requested an interpreter during their interactions with the hospital and "on many occasions [an interpreter] was not provided" and (2) they did not understand the information the hospital staff tried to convey through other

11

means, such as written notes.[5]  Gervarzes and D'Ambrosio never specified what information they did not understand.

Nearly a month after they filed their initial response, and after Defendants had already filed their reply, Plaintiffs sought leave to supplement the summary judgment record by designating additional deposition testimony.  Even had it been timely, this tardy submission still failed to comply with the Federal Rules of Civil Procedure because Plaintiffs never offered any specific cites in their belated offering.  *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring a party who asserts that a fact is genuinely disputed to support the assertion by "citing to particular parts of materials in the record").  The district court denied the motion.  In their subsequent motion to reconsider, Plaintiffs attached D'Ambrosio's complete deposition as an exhibit and, only then, did they finally cite to specific portions of the testimony on which they relied.  The district court granted Defendants' motion to strike this untimely proffer of evidence, and it denied reconsideration.

We review the district court's rulings on the motion to supplement and the motion to reconsider for an abuse of discretion.  *See* Fed. R. Civ. P. 56(e) (permitting but not requiring the district court to "give an opportunity to properly support or address" a fact); *Sanderlin v. Seminole Tribe of Florida*, 243 F.3d 1282,

---

[5]  They also attached to the declarations some hospital records, including D'Ambrosio's discharge summary and selected handwritten notes that D'Ambrosio and Gervarzes had exchanged with hospital staff.

1285 (11th Cir. 2001) ("The denial of a motion for reconsideration . . . is reviewed only for abuse of discretion."). We find no abuse of discretion. *See Fils v. City of Aventura*, 647 F.3d 1272, 1283 (11th Cir. 2011) ("the district court does not abuse its discretion simply because the appellate court would have handled the issue differently").

Pursuant to Rule 56, Plaintiffs were required to cite in their initial response the "particular parts" of any depositions relied upon in opposition to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). The depositions at issue had been available to Plaintiffs for more than six months when they filed their response, and Plaintiffs were aware that Defendants had cited portions of these same depositions in support of their motion for summary judgment. Yet, Plaintiffs did not offer, and still do not offer, any reason for neglecting to provide the required citations or to respond specifically to the evidence cited by Defendants. Even when they filed their subsequent motion to supplement, Plaintiffs still failed to cite to "particular parts" of the depositions, as required by Rule 56.

Plaintiffs finally provided citations to D'Ambrosio's deposition in their motion to reconsider. However, given the unexplained delay and the previous failure to provide any specific citations, our precedent and the governing federal rules did not require the district court to consider D'Ambrosio's deposition transcript. *See* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited

13

materials, but it may consider other materials in the record."); *Young v. City of Palm Bay, Florida,* 358 F.3d 859, 864 (11th Cir. 2004) ("the district court had a range of options which included refusing to consider untimely filings"). Accordingly, we find no abuse of discretion by the district court in denying Plaintiff's motions to supplement and to reconsider.

## II.    Summary Judgment Motion

### A.    Standard of Review

We review the district court's order granting summary judgment *de novo*. *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1141 (11th Cir. 2014). We apply the same standard as the district court, viewing the facts and drawing all reasonable inferences in the light most favorable to Plaintiffs. *Liese v. Indian River Cnty. Hosp. Dist.*, 701 F.3d 334, 337 (11th Cir. 2012).

### B.    Applicable Law

Plaintiffs' ADA and Rehab Act claims are governed by the same legal standard. *See Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000). To prevail, Plaintiffs must prove (1) that they are qualified individuals with a disability, (2) who were excluded from participation in or denied the benefits of the hospital's services, programs, or activities, or otherwise discriminated against, (3) on account of their disability. *See Shotz v. Cates*, 256 F.3d 1077, 1079 (11th Cir. 2001). Further, to recover compensatory damages, Plaintiffs must also show that the

14

exclusion or denial was the result of intentional discrimination. *Liese*, 701 F.3d at 344 (citing *Wood v. President & Trs. of Spring Hill Coll.*, 978 F.2d 1214, 1219 (11th Cir. 1992)).  Here, Plaintiffs sought both compensatory damages and injunctive relief in their complaint.  There is no dispute that Plaintiffs are qualified individuals with a disability.  The question is whether the hospital excluded Plaintiffs from, or denied them the benefits of, the hospital's services or programs by failing to provide a live ASL interpreter every time an interpreter was requested.

The governing regulations provide that such an exclusion or denial occurs when a hospital fails to provide "appropriate auxiliary aids" to a deaf individual, including a deaf companion, "where necessary to ensure effective communication."  28 C.F.R. § 36.303(c)(1).  *See also* 28 C.F.R. § 36.202(b) (requiring public accommodations to provide an "equal" opportunity for the hearing impaired to participate in and benefit from services).  "Companion" includes a family member of an individual seeking access to a hospital's services. 28 C.F.R. § 36.303(c)(1)(i).  Appropriate auxiliary aids include live interpreters or video remote interpreting systems, among other aids such as computer-aided transcription services, written materials, and exchange of written notes.  *See* 28 C.F.R. § 36.303(b).  The type of aid that is necessary varies depending on the individual's communication method, the "nature, length, and complexity" of the

15

involved communication, and the context in which the communication occurs. 28 C.F.R. § 36.303(c)(1)(ii).

In accordance with the above regulations, this Court has recognized that the question whether a hospital has provided appropriate auxiliary aids to a deaf patient is generally a "fact-intensive" inquiry that depends on context, especially the nature, significance, and complexity of the involved treatment. *Liese*, 701 F.3d at 342. We have thus held that a live ASL interpreter might be necessary for a patient to understand a complex procedure such as gallbladder surgery. *Id.* at 343-44 (finding a question of fact as to whether a hospital violated the ADA and the Rehab Act where a deaf patient asked for an interpreter but did not receive one, and thus did not understand much of what was conveyed to her, via lip-reading, notes, and pantomiming, about her proposed gallbladder removal surgery). Yet we have also warned that not every denial of a request for an auxiliary aid precludes summary judgment or creates liability under the ADA or the Rehab Act. *Id.* at 343. Otherwise, a requested service would automatically be transformed into a "necessary" service merely by the fact that it was requested. *Id.* ("[C]onstruing the regulations in this manner would effectively substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid.").

16

C.    **Exclusion or Denial of Benefits**

1.    John D'Ambrosio

The record here indicates that the hospital provided the appropriate auxiliary aids necessary to ensure that D'Ambrosio could effectively communicate with hospital staff.  It is undisputed that the staff immediately requested a live ASL interpreter for D'Ambrosio as soon as he arrived at the hospital.  The request was cancelled only when it was determined that D'Ambrosio needed an emergency catheterization procedure.  The reason for the cancellation is obvious:  time was of the essence in performing the catheterization and waiting for a live interpreter would have been severely detrimental to D'Ambrosio's health.  Indeed, had the doctors not gotten D'Ambrosio into the catheterization lab as quickly as possible, but instead waited for an interpreter to arrive, they might well have been unable to save his life.  In short, the biggest barrier to the staff's ability to converse with D'Ambrosio at that time was not the absence of a live ASL interpreter, but the fact that the doctors had to immediately begin the procedure necessary to save his life.

The undisputed evidence further shows that during D'Ambrosio's hospitalization following the catheterization, Dr. Wilson and other staff used a variety of appropriate auxiliary aids to ensure effective communication with him, including simple but detailed written notes and graphics.  It is undisputed that D'Ambrosio can read and write English and that he regularly uses writing,

17

including texting, to communicate with hearing and deaf individuals in other contexts.  In fact, in his declaration, D'Ambrosio never specifies what, exactly, he failed to understand in these written notes and graphics.[6]  In addition, it is undisputed that the hospital provided D'Ambrosio with bedside webcam interpreting services on June 24th, and with eight hours of live ASL interpreting services between June 26th and his discharge from the hospital on June 28th.

In light of the above evidence, the declarations D'Ambrosio and his girlfriend provided to the district court were insufficient to show that the hospital failed to provide aids necessary to ensure effective communication, in violation of the ADA or the Rehab Act.  Nor could a jury have reasonably inferred a violation based on the cited portions of D'Ambrosio's deposition testimony.  In fact, D'Ambrosio's deposition testimony clarifies that the basis of his discrimination claim is that he did not receive round-the-clock live ASL interpreting services during his hospitalization.[7]  As we explained in *Liese*, a hospital is not required by the ADA or the Rehab Act to provide every auxiliary aid that is demanded.  *Liese,* 701 F.3d at 343.  *See also McCullum*, 768 F.3d at 1147 (the applicable regulations

---

[6] In his brief, D'Ambrosio asserts that certain written exchanges reveal the existence of "communication barriers."  Leaving aside the fact that D'Ambrosio did not include this assertion in his declaration, the cited written notes, when read in context, do not demonstrate any lapse in comprehension.

[7] D'Ambrosio testified at his deposition that he believed a live ASL interpreter should have been present at all times during his hospitalization, even when he was asleep or unconscious.

18

"do not require healthcare providers to supply any and all auxiliary aids even if they are desired and demanded").  Because there is no evidence that the hospital failed to provide auxiliary aids that were necessary to ensure effective communication with D'Ambrosio, Defendants are entitled to summary judgment on his claims.

### 2.    Yolanda Gervarzes

Like D'Ambrosio, Gervarzes submitted a declaration in response to Defendants' summary judgment motion stating that she requested live ASL interpreting services, that the services were not provided, and that, as a result, she was unable to participate in her daughter's care.  Gervarzes did not specify how her participation was limited.  Moreover, there is undisputed evidence that Gervarzes was offered interpreting services over the LifeLinks system upon her arrival to the hospital, but she rejected those services.  She then was provided at least five hours of live ASL interpreting services during her daughter's hospitalization.  When a live interpreter was not there, the staff was able to communicate with Gervarzes via her daughter and by writing notes.  Given this evidence, a reasonable jury could not conclude that the hospital failed to provide the auxiliary aids necessary for effective communication with Gervarzes.  Thus, the district court properly granted summary judgment to Defendants on her claims.

19

### 3.    Richard Martin

Finally, as to Richard Martin, he failed, both in the district court and on appeal, to cite to any evidence showing that he ever asked for a live interpreter during his brief emergency room visit.  Martin's treating physician Dr. Kocisko testified that Martin did not ask for a live interpreter and further that, given how minor Martin's injury was—essentially a "bump on the head,"—an interpreter was not necessary.  Martin received typed instructions upon his discharge, which he indicated he understood, and it is undisputed that Martin was able to read and write English.  Given this evidence, the hospital did not violate the ADA or the Rehab Act by failing to provide a live interpreter to Martin on this particular occasion. *Cf. Liese,* 701 F.3d at 343-44 (finding that a live interpreter might be required to explain the plaintiff's emergency gallbladder surgery).

### D.    Compensatory Damages

Assuming Defendants did fail to provide appropriate and necessary auxiliary aids, such a failure by itself does not sustain a claim for compensatory damages. *Id.* at 344.  Plaintiffs must also show by a preponderance of evidence that the failure was the result of intentional discrimination.  *Id.* (citing *Wood*, 978 F. 2d at 1219).  Plaintiffs can meet this requirement with evidence that Defendants were "deliberately indifferent" to their rights under the ADA and the Rehab Act.  *Id.* at 345.

Deliberate indifference occurs when a defendant knows that a rights violation is substantially likely and fails to act on that likelihood. *Id.* at 344; *see also Doe v. Sch. Bd. of Broward Cnty., Florida*, 604 F.3d 1248, 1259 (11th Cir. 2010) (describing deliberate indifference as "an exacting standard"). As the name implies, deliberate indifference involves a "deliberate choice." *Liese,* 701 F.3d at 344. Mere negligence is insufficient. *See Kelley v. Hicks,* 400 F.3d 1282, 1285 (11th Cir. 2005) (applying the deliberate indifference standard in an Eighth Amendment case). As such, a hospital's failure to provide an interpreter on demand is not sufficient to support a finding of deliberate indifference. *McCullum*, 768 F.3d at 1147. Rather, a plaintiff must show that hospital staff knew there was a substantial likelihood that they would be unable to communicate effectively absent an interpreter, but still made a "deliberate choice" not to provide one. *Id.* at 1147-48.

Here, the district court, having based its grant of summary judgment on Plaintiffs' failure to offer evidence that Defendants failed to provide appropriate aids necessary to effective communication, did not need to reach the question whether Defendants had acted with deliberate indifference to Plaintiffs' rights under the pertinent statutes. We likewise do not need to explore Defendants' state of mind except to note the obvious: when a plaintiff cannot show that a defendant failed to provide appropriate communication aids, that plaintiff has also necessarily

21

failed to show that the defendant acted with deliberate indifference to the plaintiff's rights under the relevant statutes. *Cf. Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 276 (2d Cir. 2009) (finding an issue of fact as to deliberate indifference where the defendant hospital failed to provide any interpretive services whatsoever during the twelve-day period following a heart patient's surgery and subsequent stroke and convalescence).

## CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.