**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 13, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STANLEY CROPP; CATHERINE
CROPP,

      Plaintiffs - Appellants,

v.

LARIMER COUNTY, COLORADO;
KANDI WULFERT, Corporal of Larimer
County Sheriff's Office, in her individual
capacity,

      Defendants - Appellees.

No. 18-1262
(D.C. No. 1:15-CV-02806-JLK)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **MORITZ**, Circuit Judges.
_____

Plaintiffs Stanley Cropp and Catherine Cropp (collectively, the Cropps) brought

suit against defendant Larimer County (the County), alleging that the County violated

their rights under Title II of the Americans with Disabilities Act (ADA) of 1990, 42

U.S.C. § 12132, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. The

district court granted summary judgment to the County. The Cropps now appeal the

district court's order. For the reasons discussed below, we affirm in part, reverse in part,

---

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. But it may be cited for its
persuasive value. *See* Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

and remand to the district court for further proceedings consistent with this order and judgment.

## Background[1]

Mr. Cropp suffers from Alzheimer's disease and dementia. Late one evening, Mr. Cropp was on a walk by himself near the Cropps' Colorado home when officers with the Fort Collins Police department stopped him and began asking him questions. Confused by the encounter, Mr. Cropp attempted to walk away. In response, the officers violently tackled him, threw him into the gravel, handcuffed him, and arrested him.[2] They then transported Mr. Cropp to the Larimer County Jail (the Jail).

When Mrs. Cropp learned of Mr. Cropp's arrest and went to the Jail to obtain his release, she informed Kandi Wulfert, a Corporal with the Larimer County Sheriff's Office, that Mr. Cropp suffers from Alzheimer's disease. Mrs. Cropp then asked Wulfert what steps she needed to take to secure Mr. Cropp's release. In response, Wulfert told her that the Jail could not release Mr. Cropp until he signed an appearance-bond form. Yet as Mr. Cropp then explained to Mrs. Cropp via the Jail's internal telephone system, he did

---

[1] We derive most of these historical facts from the district court's order granting the County's motion for summary judgment. We view these facts in the light most favorable to the Cropps as the nonmoving parties. *See Knopf v. Williams*, 884 F.3d 939, 946 (10th Cir. 2018). We also resolve all factual disputes and draw all reasonable inferences in their favor. *See id.*

[2] The Cropps assert that the arrest violated Mr. Cropp's constitutional rights. But they also concede they have since settled their constitutional claims against the City of Fort Collins, which is not a party to this appeal. Further, the Cropps do not suggest that the circumstances of Mr. Cropp's arrest have any bearing on their Title II or § 504 claims. Accordingly, although the dissent discusses the arrest at some length, *see* Dissent 3–4, we offer no further comment on the arrest or its constitutionality.

2

not understand the form he needed to sign. Thus, Mrs. Cropp requested permission "to sit next to her husband to help explain the situation and assist him in completing the release paperwork." App. vol. 4, 1080. Jail officials countered by offering Mrs. Cropp a chance to speak to Mr. Cropp "using the visitation booth in the booking area." *Id.* at 1081. This arrangement would have allowed the Cropps to speak via telephone and to see each other face-to-face—albeit "through a glass partition." *Id.* In addition, jail officials provided Mr. Cropp with access to "pretrial staff" who "discussed the paperwork with [him] during intake." *Id.* at 1091. "[J]ail personnel" also "attempted to explain the pretrial process and paperwork requirements to" Mrs. Cropp. *Id.* And when Mrs. Cropp asked to speak to a nurse, Wulfert "got the nurse for [her]." App. vol. 1, 205.

Mrs. Cropp declined to speak to the nurse because Wulfert insisted upon being present during the conversation. Likewise, Mrs. Cropp refused to use the visitation booth because she "did not feel" she could fully explain the appearance-bond form to Mr. Cropp "through the glass and a phone." *Id.* at 196. More specifically, she "did not feel that [she] could sit down and go, [']This part says this, this is where you would sign this one, if you understand it.[']" *Id.* And Mrs. Cropp informed jail officials of these concerns. That is, she told them that she could not "show" the appearance-bond form to Mr. Cropp "and go over it" with him "so he would have true understanding" of its contents with a glass partition between them. *Id.* at 255–56. She further stated, "I cannot do that as well: [']Do you see this here; this is what it's saying to you.['] I can't do that." *Id.* at 256. Nevertheless, jail officials denied Mrs. Cropp's request to sit with Mr. Cropp,

3

citing the Jail's "policy prohibiting physical[-]contact visitation between pretrial detainees and their family members."[3] App. vol. 4, 1080.

Mr. Cropp eventually signed the appearance-bond form without Mrs. Cropp's assistance. But by then, he had spent approximately eleven hours in custody.

Following Mr. Cropp's release, the Cropps sued the County. As relevant here, they alleged the County (1) discriminated against Mr. Cropp in violation of Title II and § 504 by denying him access to an unobstructed physical-contact visit with Mrs. Cropp, during which he could have discussed with her the meaning of the appearance-bond form; and (2) violated Mrs. Cropp's rights under Title II by discriminating against her based on her association with Mr. Cropp and by retaliating against her for engaging in protected activities.

The County then filed a motion for summary judgment on the Cropps' Title II and § 504 claims, and the district court granted that motion. The Cropps now appeal the district court's order granting summary judgment to the County on those claims.[4]

**Analysis**

In asserting that the district court erred in granting summary judgment to the

---

[3] Based on concerns about "the safety and security of people and . . . the security of the building," the Jail generally prohibits detainees from having physical contact with *any* civilians—not just their family members. App. vol. 3, 606. But the Jail does allow attorneys to "sit with their client[s]." *Id.* at 696.

[4] In addition to their Title II and § 504 claims, the Cropps brought various other claims, alleging that the County violated their rights under the First and Fourteenth Amendments. The district court granted summary judgment to the County on those claims as well, and the Cropps do not challenge those aspects of the district court's order. Accordingly, we need not and do not address the merits of those claims.

County, the Cropps advance two arguments. First, they insist that a reasonable jury could find that the County intentionally "denied Mr. Cropp meaningful access to its programs and services by depriving him of the opportunity non-disabled people have to interpret the legal paperwork he was given [at the Jail] before choosing whether to sign it, in violation of [Title II] and [§ 504]." Aplt. Br. 21–22. Second, they allege that "a jury could properly find that [the] County discriminated and retaliated against Mrs. Cropp herself in violation of her own rights under [Title II]." *Id.* at 22.

In evaluating these arguments, we review de novo the district court's order granting summary judgment to the County. *See J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1294 (10th Cir. 2016). Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute "is genuine 'if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way.'" *J.V.*, 813 F.3d at 1295 (quoting *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013)). A dispute "is material 'if under the substantive law it is essential to the proper disposition of the claim.'" *Id.* (quoting *Becker*, 709 F.3d at 1022).

Before evaluating the Cropps' arguments under this standard, we pause here to clarify the precise nature of the claims before us. As discussed above, *see supra* note 4, the Cropps brought several distinct claims, including (but not limited to) their Title II and § 504 claims. And in bringing these various claims, the Cropps also requested various forms of relief, including (1) compensatory damages, (2) declaratory relief, (3) injunctive relief, and (4) punitive damages. However, it is not clear from the Cropps' complaint

5

whether they sought all four forms of relief on each of their various claims. Nor is it clear that the district court understood them to be doing so; indeed, in granting the County's motion for summary judgment, the district court mentioned only compensatory damages. Nevertheless, the Cropps assert on appeal that they sought both compensatory damages *and* injunctive relief as remedies for their Title II and § 504 claims. Thus, in an abundance of caution, we assume that the district court implicitly adjudicated their requests for both types of relief when it granted the County's motion for summary judgment on those claims.

Yet to the extent the district court implicitly ruled on the Cropps' request for injunctive relief, it lacked jurisdiction to do so. By the time the Cropps filed suit against the County, Mr. Cropp was no longer in jail. And in the absence of any argument from the Cropps on this point, "we decline to speculate" about whether he "will likely end up [there] again" at some point "in the future." *Barney v. Pulsipher*, 143 F.3d 1299, 1306 n.3 (10th Cir. 1998). Thus, we hold that the Cropps lacked standing to seek injunctive relief on their Title II and § 504 claims. *See id.* (holding that plaintiffs lacked standing to pursue claims for injunctive relief arising from their past confinement (citing *City of L.A. v. Lyons*, 461 U.S. 95, 104–05 (1983))). We therefore (1) reverse the district court's order to the extent it implicitly granted summary judgment to the County on the Cropps' Title II and § 504 claims for injunctive relief and (2) remand to the district court with directions to vacate that portion of its order and dismiss those claims without prejudice. *See Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 555 (10th Cir. 2016).

6

Notably, however—and in stark contrast to their requests for injunctive and compensatory relief—the Cropps make no mention of declaratory relief on appeal. Accordingly, we see no reason to suspect they requested such relief below on their Title II and § 504 claims, let alone that the district court resolved whether they were entitled to such relief for purposes of these particular claims. Further, punitive damages are not available under Title II or § 504. So even assuming the Cropps sought such relief below, the County was necessarily entitled to summary judgment on that aspect of their Title II and § 504 claims. *See Barnes v. Gorman*, 536 U.S. 181, 189 (2002). Accordingly, for the remainder of this order and judgment, we focus solely on what remains of the Cropps' Title II and § 504 claims: their claims for compensatory damages.

## I.     Mr. Cropp's Title II and § 504 Claims for Compensatory Damages

Both Title II and § 504 prohibit disability-based discrimination. *See* § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."); § 794(a) ("No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance."); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001) ("Congress enacted the ADA in 1990 to remedy widespread discrimination against disabled individuals."); *Arbogast v. Kan., Dep't of Labor*, 789 F.3d 1174, 1182 (10th Cir. 2015) ("Congress

7

enacted the Rehabilitation Act of 1973 to combat discrimination targeted toward individuals with physical and mental disabilities.").

To effectuate the ADA's nondiscrimination mandate, the Department of Justice has promulgated a series of regulations.[5] *See* 42 U.S.C. § 12134; *Robertson v. Las Animas Cty. Sheriff's Dep't*, 500 F.3d 1185, 1195 (10th Cir. 2007). As relevant here, one of those regulations requires public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."[6] 28 C.F.R. § 35.130(b)(7)(i). The thrust of Mr. Cropp's Title II and § 504 claims is that by denying him access to the requested physical-contact visit with Mrs. Cropp—a visit that Mr. Cropp says he needed in order "to interpret the [J]ail's complex legal forms" and secure his release from custody—the County intentionally discriminated against him by "failing to reasonably accommodate [his] disability."[7] Aplt. Br. 16; Rep. Br. 1.

---

[5] Because Title II's nondiscrimination language is nearly identical to § 504's nondiscrimination language, and because Mr. Cropp's Title II and § 504 claims do not differ in any material respect, we address these claims together. *Cf. Cohon ex rel. Bass v. N.M. Dep't. of Health*, 646 F.3d 717, 725–26 (10th Cir. 2011).

[6] We use the terms "reasonable modifications" and "reasonable accommodation[s]" interchangeably. *Cf. Robertson*, 500 F.3d at 1195 n.8.

[7] We have previously "recognized two types of [Title II] claims: (1) exclusion from or denial of benefits and (2) discrimination." *J.V.*, 813 F.3d at 1295. And we have further explained that there are "three ways to establish a discrimination claim: (1) intentional discrimination (disparate treatment); (2) disparate impact; and (3) failure to make a reasonable accommodation." *Id.* Here, the district court analyzed Mr. Cropp's Title II and § 504 claims under both the first and third discrimination theories we

In particular, Mr. Cropp alleges the County was obligated to ensure that its communications with him via the Jail's appearance-bond form were as effective as its communications with other inmates via that same form. *See* 28 C.F.R. § 35.160(a)(1) ("A public entity shall take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others."). And to comply with that obligation, he asserts, the County was required to provide him with an auxiliary aid that enabled him to understand the appearance-bond form as well as other inmates. *See* § 35.160(b)(1) ("A public entity shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities, including applicants, participants, companions, and members of the public, an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."). More specifically, Mr. Cropp alleges the County was required to provide him access to the requested physical-contact visit with Mrs. Cropp because it was the only auxiliary aid that would allow him to understand the Jail's appearance-bond form well enough to sign that form and avail himself of the benefit of being released on his own recognizance. *See id.* Without access to such a physical-contact visit, Mr. Cropp maintains, the County's communications with him via the appearance-bond form were not as effective as the County's communications with other inmates via that same form. *See* § 35.160(a)(1).

---

recognized in *J.V.* But Mr. Cropp has since clarified that he is "proceeding" solely "under the third theory." Aplt. Br. 38 n.14. Thus, for purposes of this portion of our discussion, we limit our analysis to whether the district court erred in granting summary judgment to the County on Mr. Cropp's failure-to-accommodate claims.

9

In rejecting these arguments and granting summary judgment to the County on Mr. Cropp's failure-to-accommodate claims, the district court recognized that the County had a duty to "make reasonable modifications" to the County's "policies, practices, [and] procedures" if such "modifications [were] necessary to avoid discriminat[ing]" against Mr. Cropp "on the basis of [his] disability." App. vol. 4, 1091 (quoting § 35.130(b)(7)(i)). Likewise, the district court acknowledged that this duty required the County to take "appropriate steps to ensure that" the County's "communications with" Mr. Cropp via the Jail's appearance-bond form were "as effective as" the County's communications with other inmates. *Id.* at 1092 (quoting § 35.160(a)(1)). Nevertheless, the district court ruled that the County's refusal to provide Mr. Cropp with access to a physical-contact visit did not violate Title II or § 504.

In doing so, the district court first concluded that the "service" Mr. Cropp sought access to was a physical-contact visit. *Id.*; *see also* § 12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity . . . ."). And because "no other inmates" had access to this particular "service," the district court reasoned that the County had no duty to "modify" the Jail's policies to make this "service" available to Mr. Cropp. App. vol. 4, 1092; *see also Taylor v. Colo. Dep't of Health Care Policy & Fin.*, 811 F.3d 1230, 1236 (10th Cir. 2016) (noting public entity was under no obligation to modify its program unless plaintiff showed that without such modification, plaintiff could not "obtain the same benefits made available to nondisabled individuals").

10

But as Mr. Cropp points out, the service he sought access to was not, as the district court found, a physical-contact visit. Instead, the service Mr. Cropp sought access to was the opportunity to understand the Jail's appearance-bond form well enough to sign that form and "be released from jail on his own recognizance." Rep. Br. 7. The physical-contact visit was merely the auxiliary aid via which Mr. Cropp asserted he could access that service. To the extent the district court ruled otherwise, it erred.

Nevertheless, that error does not necessarily require reversal; the district court made three other intermediate rulings that could conceivably support its ultimate order granting summary judgment to the County on Mr. Cropp's failure to accommodate claims.

First, the district court determined the County was entitled to summary judgment because Mr. Cropp failed to present sufficient evidence from which a jury could conclude that a physical-contact visit was "necessary" to make the County's communications with Mr. Cropp "as effective as [its] communications with other detainees." App. vol. 4, 1093; *see also* § 35.160(b)(1) (requiring public entities to "furnish appropriate auxiliary aids . . . where necessary to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of," public entity's services, programs, and activities). And the court further ruled that the County "ma[d]e reasonable accommodations to ensure Mr. Cropp had meaningful access to its services" by providing him with access to the visitation booth—even if Mr. Cropp would have preferred a physical-contact visit. App. vol. 4, 1093; *cf. Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1263 (10th Cir. 2001) ("[T]he ADA requires an employer to provide a 'reasonable

11

accommodation, not the accommodation [the disabled individual] would prefer.'"

(quoting *Rehling v. City of Chi.*, 207 F.3d 1009, 1014 (7th Cir. 2000))).

Second, the district court ruled that Mr. Cropp failed to present any evidence from which a reasonable jury could conclude that the County *intentionally* discriminated against him. Specifically, the district court found that Mr. Cropp failed to present evidence that in denying him access to a physical-contact visit, the County acted with (1) "discriminatory animus" or (2) deliberate indifference. App. vol. 4, 1090; *see also Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1152–53 (10th Cir. 1999) (setting forth means by which plaintiff can prove intentional discrimination under § 504).

Third, the district court ruled that the County was entitled to summary judgment on Mr. Cropp's failure-to-accommodate claims because it successfully demonstrated that providing Mr. Cropp with access to a physical-contact visit "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." App. vol. 4, 1092 (quoting 28 C.F.R. § 35.164); *see also* § 35.164 (stating that ADA does not "require a public entity to take any action that it can demonstrate would result in" such alteration).

On appeal, the parties debate whether the district court erred in ruling that Mr. Cropp failed to present any evidence from which a reasonable jury might conclude that by denying him a physical-contact visit, the County discriminated against him by depriving him of "meaningful access to its programs and services." App. vol. 4, 1093–94. And they similarly spar over whether the district court erred in ruling that providing Mr. Cropp with access to the requested physical-contact visit would have "result[ed] in a

12

fundamental alteration in the nature of" the County's services, programs, or activities "or in undue financial and administrative burdens." *Id.* at 1092 (quoting § 35.164). But we need not settle these disputes to resolve this appeal. Instead, for the reasons discussed below, we conclude that even assuming Mr. Cropp presented evidence from which a reasonable jury could find the County discriminated against him by depriving him of access to a physical-contact visit, the County is nevertheless entitled to summary judgment on his failure-to-accommodate claims because—as the district court correctly concluded—Mr. Cropp failed to present any evidence from which a reasonable jury could conclude the alleged discrimination was intentional.[8]

Recall that at this juncture, Mr. Cropp's only Title II and § 504 claims are for compensatory damages. *See supra* pp. 5–7. And the district court ruled below that to recover such compensatory damages, Mr. Cropp had to "establish *intentional discrimination.*" App. vol. 4, 1089 (emphasis added). Notably, Mr. Cropp does not

---

[8] The dissent focuses on the feasibility of providing the Cropps with a physical-contact visit, emphasizing that (1) "inmates are permitted to meet face-to-face with attorneys in the booking lobby"; (2) "[t]here was no staffing shortage at the Jail that night"; (3) no one alleged the Cropps "were dangerous"; and (4) Wulfert could not identify "any burden that an in-person visit would have imposed." Dissent 5–6; *see also id.* at 10 & n.4. But neither the Cropps nor the dissent identify any authority that might indicate this evidence is relevant to the *threshold* question of whether a physical-contact visit was necessary to render the County's communications with Mr. Cropp as effective as the County's communications with other inmates, *see* § 35.160(a)(1), (b)(1), as opposed to the *secondary* question of whether—even assuming such a visit was necessary under § 35.160—the County nevertheless was not required to provide the Cropps with such a visit because doing so would fundamentally alter the nature of the Jail's services or result in undue administrative and financial burdens, *see* § 35.164. And for the reasons discussed in the text, we need not and do not reach this secondary question. Accordingly, we offer no further discussion of the evidence the dissent would rely on in doing so.

13

challenge this aspect of the district court's ruling on appeal. On the contrary, he expressly concedes the district court was correct on this point. Accordingly, we assume without deciding that Mr. Cropp must show intentional discrimination to prevail on what remains of his failure-to-accommodate claims and turn next to the intentional-discrimination inquiry.[9] *See Tyler v. City of Manhattan*, 118 F.3d 1400, 1402–03 (10th Cir. 1997) (assuming that plaintiff was required to plead and prove intentional discrimination to recover compensatory damages where district court ruled that such damages were not "available under the ADA absent intentional discrimination" and plaintiff failed to challenge that ruling on appeal).

In this context, a plaintiff can establish intentional discrimination by presenting evidence that (1) the defendant's "conduct [was] fueled by discriminatory animus," *Powers*, 184 F.3d at 1152–53 (quoting *Alexander v. Choate*, 469 U.S. 287, 296 (1985)); or (2) the defendant acted with "deliberate indifference to the strong likelihood that pursuit of its questioned policies w[ould] likely result in a violation of federally protected rights," *id.*

Here, the district court ruled that "[n]othing in the record indicate[d]" the County was "motivated by discriminatory animus based on Mr. Cropp's disability." App. vol. 4, 1090. And again, Mr. Cropp does not challenge this aspect of the district court's ruling on

---

[9]We have expressly held that "[t]o recover compensatory damages under § 504, a plaintiff must establish that the [relevant] discrimination was intentional." *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009). But we have not resolved whether the same is true of Title II. *See Hamer v. City of Trinidad*, 924 F.3d 1093, 1108–09 (10th Cir. 2019) (noting that question remains open in this circuit).

appeal. Accordingly, in determining whether Mr. Cropp made a sufficient showing of intentional discrimination, we ask only whether Mr. Cropp presented evidence from which a reasonable jury could conclude that the County acted with deliberate indifference—i.e., that it both knew "a harm to a federally protected right [was] substantially likely" and "fail[ed] to act upon that . . . likelihood." *J.V.*, 813 F.3d at 1298 (third alternation in original) (quoting *Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1139 (9th Cir. 2001)).

In arguing he made this showing here, Mr. Cropp notes that a public entity must "furnish appropriate auxiliary aids" where such aids are "necessary to afford individuals with disabilities an equal opportunity to participate in, and enjoy the benefits of," the entity's services, programs, and activities. Aplt. Br. 29; *see also* § 35.160(b)(1). And he argues that such an auxiliary aid was "necessary" here because without one, he was unable to internalize and understand the information contained in the appearance-bond form—and was therefore unable to "enjoy the benefits of" the County's "service" of releasing inmates on their own recognizance after they signed that form. Aplt. Br. 29. Further, he asserts, a jury could conclude the County was deliberately indifferent because it "had notice of the potential risk of [its] decision" to deny his request for a physical-contact visit and yet it "clearly refused the accommodation knowingly."[10] *Id.* at 27 (quoting *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 829 (D. Md. 1998)).

---

[10] The dissent posits that the County was deliberately indifferent because the Jail denied Mr. Cropp's request for a physical-contact visit "without investigation." Dissent 15 (quoting *Updike v. Multnomah Cty.*, 870 F.3d 939, 954 (9th Cir. 2017), *cert. denied sub nom. Multnomah Cty. v. Updike*, 139 S. Ct. 55 (2018)); *see also*

15

As an initial matter, we reject Mr. Cropp's suggestion that the County's mere failure to provide him with the precise auxiliary aid he requested necessarily amounts to discrimination—let alone to intentional discrimination via deliberate indifference. *See* 28 C.F.R. pt. 35, app. A, § 35.160 (noting that although public entities must "give primary consideration to the requests of individuals with disabilities," public entities need not provide the precise form of auxiliary aid requested so long as they "can demonstrate that another effective means of communication exists" (citations omitted)); *Liese v. Indian River Cty. Hosp. Dist.*, 701 F.3d 334, 343 (11th Cir. 2012) (noting that "failure to provide an interpreter on request is not necessarily deliberately indifferent to an individual's rights"); *Barber*, 562 F.3d at 1232 (declining to hold that rejecting requested accommodation "results per se in deliberate indifference"); *Tucker v. Tennessee*, 539 F.3d 526, 538 (6th Cir. 2008) (noting that § 35.160 does not "require that every potential auxiliary device be on standby so that whatever request a particular individual makes can be accommodated"), *abrogated on other grounds by Anderson v. City of Blue Ash*, 798 F.3d 338 (6th Cir. 2015); *Petersen v. Hastings Pub. Sch.*, 31 F.3d 705, 708–09 (8th Cir. 1994) (rejecting plaintiffs' argument that school district violated Title II by refusing to "utilize the signing system" of plaintiffs' choice); *cf. Selenke*, 248 F.3d at 1261 ("[A]n

---

*Updike*, 870 F.3d at 954 ("A denial of a request without investigation is sufficient to survive summary judgment on the question of deliberate indifference."). But we see no indication the Cropps advanced such a failure-to-investigate argument below. Nor do they advance one on appeal—let alone argue for plain error in doing so. Accordingly, we decline to address this waived theory. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) (explaining that "failure to argue for plain error and its application on appeal . . . marks the end of the road for an argument for reversal not first presented to the district court").

16

employer is not required to always provide the employee with the best possible accommodations or in the specific manner the employee requested. It has broad discretion in determining which alternative accommodation should be provided." (citation omitted)).

Indeed, to adopt the alternative position would replace § 35.160(b)(1)'s necessary-and-appropriate requirement with a requirement mandating that public entities furnish disabled individuals with any and all auxiliary aids they might request. *See* § 35.160(b)(1) ("A public entity shall furnish *appropriate* auxiliary aids . . . where *necessary* to afford individuals with disabilities . . . an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity." (emphases added)); *McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135, 1146–47 (11th Cir. 2014) (noting that regulations require public entities to furnish auxiliary aids when such aids are "*necessary*" and "*appropriate*," not when they are "desired" or "demanded" (quoting § 35.160(b)(1)); *cf. Liese*, 701 F.3d at 343 (refusing to "substitute 'demanded' auxiliary aid for 'necessary' auxiliary aid" (quoting 45 C.F.R. § 84.52(d)(1)).

We decline to read § 35.160(b)(1) in this manner. *Cf. United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269, 273 (1931) ("[I]t is not within the judicial province to read out of the statute the requirement of its words."). Instead, refracted through the dual lenses of § 35.160(b)(1)'s necessary-and-appropriate requirement and the test for summary judgment, the deliberate-indifference inquiry in this case turns on whether Mr. Cropp presented evidence from which a reasonable jury could conclude that (1) the County "knew there was a substantial likelihood" it "would be unable to communicate

17

effectively with him" if it denied him access to the requested physical-contact visit, *McCullum*, 768 F.3d at 1147; and (2) despite this knowledge, the County nevertheless "made a 'deliberate choice' not to provide" him with such a visit, *id.* at 1147–48 (quoting *Liese*, 701 F.3d at 344); *see also* § 35.160(a)(1) ("A public entity shall take appropriate steps to ensure that communications with . . . members of the public . . . with disabilities are as *effective* as communications with others." (emphasis added)); § 35.160(b)(2) (listing criteria for determining what "type of auxiliary aid [is] necessary to ensure *effective* communication" (emphasis added)).

Here, the County does not dispute that it deliberately chose to decline Mrs. Cropp's request for a physical-contact visit with Mr. Cropp. But it points out that it offered the Cropps a similar alternative: the opportunity for Mrs. Cropp to discuss the appearance-bond form with Mr. Cropp using the visitation booth. And it argues the visitation booth provided the Cropps with an "effective means of communication." 28 C.F.R. pt. 35, app. A, § 35.160 (citation omitted).

In addressing this argument, the dissent insists that the visitation booth cannot be considered an accommodation because the County offers the visitation booth to "*all* inmates wishing to communicate with their families"—not just to those with disabilities. Dissent 12 (emphasis added). And the Cropps echo this sentiment. But neither the Cropps nor the dissent cite any authority indicating that when a particular service is available to the general public, that service cannot qualify as an accommodation. And we know of none. On the contrary: Section 35.160 requires public entities to furnish auxiliary aids that provide individuals with disabilities "*equal* opportunit[ies]" to avail themselves of

18

the entity's services—not extra ones. § 35.160(b)(1) (emphasis added).[11] Thus, in the absence of any evidence that allowing the general public to use the visitation booth somehow rendered the visitation booth less effective to individuals with disabilities like Mr. Cropp's, we fail to see how the fact that the County offers the visitation booth to "all inmates wishing to communicate with their families" is relevant to our inquiry. Dissent 12.

Further, for purposes of resolving this appeal, we need not decide whether the visitation booth was actually an "effective means of communication." 28 C.F.R. pt. 35, app. A, § 35.160 (citation omitted). This is so because even if we assume a reasonable jury could conclude the visitation booth was *not* effective—i.e., even if we assume the County discriminated against Mr. Cropp by failing to provide him with an auxiliary aid that afforded him "an equal opportunity to benefit from" the County's practice of releasing inmates on their own recognizance after they signed the Jail's appearance-bond

---

[11] Indeed, to hold otherwise would run counter to the plain language of § 35.104, which expressly lists "closed captioning" and "large[-]print materials" as auxiliary aids. § 35.104(1), (2). Notably, if a public entity opts to communicate with the public via a video displayed on a single monitor in its lobby and uses closed captioning as it does so, the closed captioning is available to the general public—not just to those individuals with hearing-related disabilities. Likewise, if a public entity opts to communicate with its clients by providing them with written materials and uses large print in doing so, the entity's large-print materials are available to the general public—not just to those individuals with vision-related disabilities. Yet according to the dissent's logic, neither the closed captioning nor the large-print materials would qualify as auxiliary aids—or, by extension, accommodations—*even if* those services rendered the public entity's "communications with" individuals who have hearing- and vision-related disabilities "as effective as [the entity's] communications with others." § 35.160(a)(1).

19

form, *Liese*, 701 F.3d at 343; *see also* § 35.160(a)(1)—Mr. Cropp is not entitled to reversal unless he presented evidence from which a reasonable jury could conclude *the County knew* there was a substantial likelihood that access to the visitation booth would not suffice.[12] *See McCullum*, 768 F.3d at 1147. And we see no such evidence here.

Mrs. Cropp did inform jail officials that she felt she could not "show" Mr. Cropp the appearance-bond form "and go over it so he would have true understanding and sign a document that he understood" with a glass partition between them. App. vol. 1, 255–56. Specifically, she told them, "I cannot do that as well: [']Do you see this here; this is what it's saying to you.['] I can't do that." *Id.* at 256. Nevertheless, the fact remains that the auxiliary aid the County provided (i.e., a chance for Mr. Cropp to speak with Mrs. Cropp about the appearance-bond form through a glass partition in the visitation booth) is nearly identical to the auxiliary aid Mr. Cropp concedes would have been effective (i.e., the opportunity to speak to Mrs. Cropp about the appearance-bond form without such a

---

[12] In declining to resolve whether the County discriminated against Mr. Cropp, we likewise decline to resolve whether—as Mr. Cropp implicitly suggests—the County was required to provide him with an auxiliary aid that would have enabled him to *internalize and understand* the contents of the appearance-bond form as well as the Jail's other inmates, as opposed to an auxiliary aid that merely would have made the contents of the form equally "available" to him. 28 C.F.R. § 35.104(1) (defining auxiliary aids to include "methods of making aurally delivered information *available* to individuals who are deaf or hard of hearing," such as "open and closed captioning" (emphasis added)); § 35.104(2) (defining auxiliary aids to include "methods of making visually delivered materials *available* to individuals who are blind or have low vision," such as "Brailled materials" (emphasis added)). But we note in passing that Mr. Cropp does not even expressly acknowledge this distinction, let alone cite any authority to support his unspoken assumption that even if the County successfully ensured the relevant information was available to Mr. Cropp, it nevertheless discriminated against him by failing to ensure that he internalized and understood that information.

physical obstruction). In particular, both options would have provided the Cropps with an opportunity to communicate verbally while simultaneously viewing both each other *and* the appearance-bond form, thus enabling Mrs. Cropp to do precisely what she said she needed to do in order to help Mr. Cropp understand the appearance-bond form: "go over" that form with Mr. Cropp and say, "[T]his is what this says." *Id.* at 186.

Given the material similarities between the auxiliary aid the County provided and the auxiliary aid Mrs. Cropp requested, no reasonable jury could conclude the County was aware of a substantial risk that providing the former rather than the latter would render its communication with Mr. Cropp less effective than its communication with other inmates. Indeed, Mr. Cropp fails—even on appeal—to explain why or how a physical-contact visit would have provided him with a feature critical to his understanding of the form that the visitation booth "c[ould ]not" have provided.[13] *Mason*

_____

[13] The dissent alleges that "the thick glass wall physically separating the Cropps prevented Mrs. Cropp from sitting next to her husband and assisting him with the form." Dissent 10. To the extent the dissent means to suggest the glass prevented Mrs. Cropp (who was on one side) from physically touching the copy of the form that was in the possession of Mr. Cropp (who was on the other side), this much is obvious. But neither the dissent nor the Cropps identify any evidence indicating that (1) the Jail refused to provide Mrs. Cropp with *her own* copy of the form; (2) the glass somehow prevented Mrs. Cropp from touching or pointing to parts of that form as she discussed the form with Mr. Cropp; or (3) the glass somehow prevented Mr. Cropp from seeing those parts of the form as she did so. To be clear, we do not question Mrs. Cropp's statement that the glass prevented her from communicating the contents of the form to Mr. Cropp "*as well*" as she could have communicated them via the requested physical-contact visit. App. vol. 1, 256 (emphasis added). But as discussed below, the relevant comparison is not between the efficacy of the accommodation an individual with disabilities requests and the efficacy of the accommodation a public entity ultimately provides; instead, the comparison is between the efficacy of the public entity's communications with individuals who have disabilities and the efficacy of its communications with individuals who do not.

*v. Corr. Med. Servs., Inc.*, 559 F.3d 880, 883, 888 (8th Cir. 2009) ("As [plaintiff] does

not explain what [the requested accommodation] could teach him . . . that [the provided

accommodation] cannot, we see no basis on this record to overturn the district court's

decision [granting defendant's motion for summary judgment]."). And in light of Mr.

Cropp's apparent inability to identify such a feature, we fail to see how a reasonable jury

might conclude the County was able to do so—especially because the Cropps refused to

*even attempt* to use the visitation booth.[14] *Cf. McCullum*, 768 F.3d at 1148 (holding that

defendant was entitled to summary judgment on plaintiff's failure-to-accommodate claim

where "there [was] no evidence suggesting" auxiliary aids that defendant provided to

---

*See Silva v. Baptist Health S. Fla., Inc.*, 856 F.3d 824, 834, 835 n.7 (11th Cir. 2017) (noting that ADA does not require "perfect communication"; explaining that defendant was only required to provide plaintiff with auxiliary aid that was "sufficient to ensure a level of communication . . . substantially equal to that afforded to non-disabled" individuals (emphasis omitted)).

[14] We do not mean to suggest, of course, that individuals with disabilities must attempt to utilize every auxiliary aid offered before they can establish that denying them access to a requested auxiliary aid amounts to deliberate indifference. But when an individual with a disability requests a particular auxiliary aid; a public entity reasonably responds by offering the individual an auxiliary aid that is materially similar to the aid requested; and the individual refuses to even attempt to utilize the auxiliary aid the public entity offers, that refusal may become relevant to the deliberate-indifference inquiry, as we conclude it is here. The dissent suggests that engaging in such an analysis is tantamount to allowing the County to impermissibly "[c]oerce or attempt to persuade" Mrs. Cropp "to provide effective communication for" Mr. Cropp. Dissent 11 (quoting 28 C.F.R. pt. 35, app. A, § 35.160). But the Cropps' own briefing demonstrates otherwise: they expressly concede that "Mr. Cropp requested the communication facilitation of his adult wife" and that "Mrs. Cropp not only agreed to facilitate communication with her longtime husband, she insisted upon it." Aplt. Br. 34. Under these circumstances, the Jail's efforts to accede to Mr. Cropp's request (and Mrs. Cropp's demand) can hardly be characterized as improper coercion.

plaintiff "were ineffective . . . or, assuming that they were, that [defendant] knew that fact").

Instead, we conclude a reasonable jury could determine, at most, that Mrs. Cropp's statements put the County on notice of the risk that using the visitation booth might prevent Mr. Cropp from understanding Mrs. Cropp's explanation of the appearance-bond form "as well" as he would have understood it with the benefit of a physical-contact visit. App. vol. 1, 256. But Mr. Cropp fails to demonstrate this means a reasonable jury could conclude the County was aware of a "strong likelihood" that providing Mr. Cropp with access to the visitation booth in lieu of the requested physical-contact visit would violate his "federally protected rights." *Powers*, 184 F.3d at 1152–53 (quoting *Alexander*, 469 U.S. at 296). In particular, Mr. Cropp fails to cite any authority indicating he had a right to an auxiliary aid that was as effective *as the one he requested*, as opposed to an auxiliary aid that rendered the County's communication with him "as effective *as [its] communications with others*."[15] § 35.160(a)(1) (emphasis added); *see also Silva*, 856 at 834, 835 n.7 (noting that ADA does not require "perfect communication"; explaining that defendant was only required to provide plaintiff with auxiliary aid that was "sufficient to ensure a level of communication . . . substantially equal to that afforded to non-disabled" individuals (emphasis omitted)).

---

[15] We note that Mr. Cropp does not direct our attention to any information in the record that might indicate the Jail's other inmates fully and perfectly comprehended the contents of the appearance-bond form before signing it.

In other words, even assuming a reasonable jury could conclude that Mrs. Cropp's statements were sufficient to put the County on notice of a substantial risk that the visitation booth would be *less effective*, in layman's terms, than a physical-contact visit, Mr. Cropp nevertheless fails to demonstrate a reasonable jury could conclude those statements were sufficient to put the County on notice of a substantial risk that the visitation booth would be *wholly ineffective* for purposes of the ADA. *See* § 35.160(a)(1), (b)(1); *cf. Barber*, 562 F.3d at 1230–31 (holding that defendant did not act with deliberate indifference when it refused to provide plaintiff with requested accommodation, in part because defendant offered plaintiff "another objectively reasonable alternative"). Accordingly, we conclude that Mrs. Cropp's statements were insufficient to create a question of material fact sufficient to defeat the County's motion for summary judgment.

But that does not end the matter. Mr. Cropp also asserts a reasonable jury could conclude the County was deliberately indifferent because it failed to adequately train the Jail's staff. In support, he repeatedly asserts that the County failed to provide adequate ADA and Rehabilitation Act training to its employees. Yet such "bare allegation[s] of [a defendant's] failure to train" are not "nearly enough to show deliberate indifference." *J.V.*, 813 F.3d at 1298. Instead, as a threshold matter, Mr. Cropp must demonstrate that the County "was on notice of the need for more or better training." *Id.* And according to the district court, Mr. Cropp failed to make this showing below.

In what we construe as an effort to challenge this portion of the district court's ruling, Mr. Cropp asserts on appeal that "the [Department of Justice] recently investigated [the County] for failing to provide appropriate auxiliary aids . . . to . . . deaf

24

inmates." Aplt. Br. 54. Presumably, Mr. Cropp means to suggest either that the investigation put the County on notice of the need for additional training or that the need for an investigation indicates the need for training was obvious. Yet the portion of the record Mr. Cropp cites does not provide any information about when this investigation began, when the County learned of it, or the events that prompted it. *Cf.* Fed. R. App. P. 28(a)(8)(A) (requiring appellant's brief to contain "appellant's contentions and the reasons for them, with citations to the . . . parts of the record on which the appellant relies"). And in the absence of any information about when the investigation began and when the County learned of it, the mere fact of the investigation does not demonstrate that the County was "on notice"—when the events that gave rise to this litigation transpired—"of the need for more or better training."[16] *J.V.*, 813 F.3d at 1298. Likewise, in the absence of any information about the specific events that precipitated the investigation, the mere fact of the investigation does not establish that "the need for more or different training [was] so obvious, and the inadequacy so likely to result in the violation of" Title II or § 504, that the County "can reasonably be said to have been deliberately indifferent to the need" for such training. *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)).

---

[16] The County asserts the investigation began in 2016—years after the events here transpired (and therefore too late to provide it with notice for purposes of Mr. Cropp's failure-to-train theory). But the County does not provide a record cite to support this assertion. Accordingly, we take no position on when the investigation commenced and hold only that Mr. Cropp fails to satisfy his burden, as the appellant, to provide us with the factual predicate necessary to support his notice argument. *See* Fed. R. App. P. 28(a)(8)(A).

25

Accordingly, we agree with the district court: "Mr. Cropp fail[ed] to establish deliberate indifference based on a failure-to-train theory." App. vol. 4, 1091. And because that means Mr. Cropp also failed to establish the County *intentionally* discriminated against him, the County is entitled to summary judgment on what remains of Mr. Cropp's failure-to-accommodate claims (i.e., his claims for compensatory damages)—even assuming the County discriminated against him in violation of Title II and § 504 by failing to provide him with a necessary and appropriate auxiliary aid. We therefore affirm the district court's order granting summary judgment to the County on these claims.

## II.   Mrs. Cropp's Associational-Discrimination and Retaliation Claims

Having concluded that the district court properly granted summary judgment to the County on Mr. Cropp's Title II and § 504 claims for compensatory damages, we turn next to Mrs. Cropp's argument that the district court erred in likewise granting summary judgment to the County on her related claims for associational discrimination and retaliation. *See* 42 U.S.C. § 12133 (extending Title II's "remedies . . . and rights . . . to any person alleging discrimination on the basis of disability"); 42 U.S.C. § 12203(a) (prohibiting discrimination based on individual's opposition to "any act or practice" that is "unlawful" under Title II); § 35.130(g) (prohibiting public entities from "exclud[ing] or otherwise deny[ing] equal services, programs, or activities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association").

In granting summary judgment to the County on Mrs. Cropp's claims, the district

26

court concluded that because Mr. Cropp's claims failed as a matter of law, Mrs. Cropp's related claims necessarily failed as well. Notably, in challenging this ruling, Mrs. Cropp does not dispute that her claims rise and fall with Mr. Cropp's. Instead, she merely (1) argues that the district court erred in granting summary judgment to the County on Mr. Cropp's claims and (2) asserts that to the extent his claims remain viable, so too do hers. But for the reasons discussed above, we conclude that the district court properly granted summary judgment to the County on Mr. Cropp's claims. And because Mrs. Cropp does not identify any other basis for disturbing the district court's ruling granting summary judgment to the County on her claims, we affirm that ruling as well.[17]

## Conclusion

Because no reasonable jury could find the County intentionally discriminated against Mr. Cropp in violation of Title II or § 504 by denying him access to a physical-contact visit, the district court correctly granted summary judgment to the County on Mr. Cropp's Title II and § 504 claims for compensatory damages. And Mrs. Cropp does not dispute that if Mr. Cropp's claims fail as a matter of law, then the County is also entitled to summary judgment on her associational-discrimination and retaliation claims. Accordingly, we affirm the district court's order granting summary judgment to the County on the Cropps' claims for compensatory damages. But to the extent the district

---

[17] In doing so, we need not address whether—as the County suggests—Mrs. Cropp lacked Article III standing to pursue her claims. Courts must generally resolve such jurisdictional questions before proceeding to the merits. But this general rule does not apply where, as here, "the merits have already been decided in the court's resolution of a claim over which it did have jurisdiction." *Starkey ex rel. A.B. v. Boulder Cty. Soc. Servs.*, 569 F.3d 1244, 1260 (10th Cir. 2009).

court implicitly ruled on the Cropps' claims for injunctive relief, we reverse and remand to the district court with directions to dismiss that aspect of the Cropps' claims without prejudice. *See supra* pp. 5–7.

Entered for the Court


Nancy L. Moritz
Circuit Judge

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 13, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

STANLEY CROPP; CATHERINE
CROPP,

      Plaintiffs - Appellants,

v.

LARIMER COUNTY, COLORADO;
KANDI WULFERT, Corporal of Larimer
County Sheriff's Office, in her individual
capacity,

      Defendants - Appellees.

No. 18-1262
(D.C. No. 1:15-CV-02806-JLK)
(D. Colo.)

_____

**PUBLISHED CONCURRENCE AND DISSENT**
_____

**LUCERO**, J., concurring in part and dissenting in part:

Few in our country have been untouched by Alzheimer's disease. With

increased longevity, "dementia has emerged as the central public health epidemic of

the industrialized world." Marshall B. Kapp, Legal Standards for the Medical

Diagnosis & Treatment of Dementia, 23 J. Legal Med. 359, 363 (2002) (quoting

David Shenk, The Forgetting—Alzheimer's: Portrait of an Epidemic 163 (2001))

(emphasis omitted). As dementia rates have risen in the general population, so too

has dementia become more common in prisons and jails. See Yelena Yukhvid, Note,

Should Elderly Criminals Be Punished for Being Prisoners of the Mind? An Analysis

of Criminals with Alzheimer's Disease, 50 Gonz. L. Rev. 43, 54 (2015). Confronted with law enforcement issues, Alzheimer's patients are frequently frightened and confused, and caring for them presents unique challenges. See id. Failure on the part of law enforcement to consider these special concerns risks harming some of the most vulnerable members of our society.

This case presents precisely such a failing. Stanley Cropp suffers from Alzheimer's disease. On the evening in question he left his home for a nightly walk. He failed to return, as he had been stopped by Fort Collins police officers and taken to the Larimer County Jail. When Catherine Cropp, Mr. Cropp's wife, was advised of his confinement, she rushed to the Jail, where she told officers that her husband suffered from Alzheimer's disease and would need loving and attentive care and direction. To help him complete forms he was required to sign, she asked to sit with her husband and explain the forms to him. Jail staff declined her request. This left Mr. Cropp in jail for the night.

My respected colleagues in the majority affirm the district court's grant of summary judgment in favor of the defendants, concluding that the Cropps failed to demonstrate the County acted with deliberate indifference.[1] (Majority Order & J. 25-26.) I respectfully disagree. I concur with the majority's conclusion regarding Mr. Cropp's claim for injunctive relief, and although I am concerned about the merits of his claim regarding the County's failure to train, on review of the record, I am

---

[1] My colleagues' nonprecedential order and judgment is Cropp v. Larimer County, No. 18-1262 (10th Cir. Nov. 13, 2019) (unpublished).

ultimately persuaded that the record was not adequately developed to the degree necessary to create a material evidentiary dispute on that issue. Therefore, I agree with the majority's conclusion regarding the County's failure to train. Nonetheless, I respectfully dissent from the majority's analysis regarding Mr. Cropp's failure-to-accommodate claim.

In my view, the Cropps have provided sufficient evidence for a reasonable jury to find the County deliberately indifferent. For eleven hours, Jail staff ignored the Cropps' repeated pleas that Mr. Cropp needed an accommodation. They continued to offer the Cropps the same services available to all inmates regardless of disability— this despite Mrs. Cropp's repeated explanation that those services would not be effective. This refusal to consider a variation from the Jail's standard practices violates the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.

**I**

When he was wrongfully arrested and detained in late December 2013, Mr. Cropp was 61 years old and experienced confusion, disorientation, and memory issues caused by Alzheimer's disease. These symptoms made social interactions and communication particularly challenging for him. Nights were especially hard because he would get tense and could not sleep. To calm himself, he often walked four blocks around his apartment building where he lived with his wife, proceeding in a circle so as not to get lost.

On the evening in question, Mr. Cropp went on his nightly walk around 10:00 p.m. He was stopped by a Fort Collins police officer. After several other officers

arrived at the scene, he was arrested, dragged into a patrol car, and booked into the Larimer County Jail.  By that time, he was frightened and battered.  He had not taken his nightly prescribed medications, necessary for him to communicate effectively with others and to stabilize his condition.  Booked into the Jail, he was confused after the trauma inflicted by the police officers.  All of this exacerbated the disorientation Mr. Cropp experiences, which worsens at night, due to Alzheimer's disease.

Notwithstanding his obvious mental state, Mr. Cropp was placed through routine intake.  A member of the Jail's pretrial services staff attempted to explain certain paperwork to him but, because of his Alzheimer's condition, he did not understand the forms and declined to sign them.  The forms included an appearance-bond form that would have allowed the Jail to release Mr. Cropp on his own recognizance.  Because he did not sign the forms, Mr. Cropp was locked into a cold cell, unable to sleep because of frigid air blowing from a vent.

Meanwhile, Mrs. Cropp, having become worried when Mr. Cropp did not return from his walk, proceeded to look for him in case he had become disoriented. In the intervening years, her husband had become dependent on her to complete many routine tasks, such as taking his medications or preparing food.  She was especially concerned because she knew how disoriented he could become at night. Just before 11 p.m., she received a call from the Larimer County Sheriff's Department informing her that her husband was in jail.  She immediately rushed to provide assistance.

As soon as she arrived, Mrs. Cropp told Jail staff, including Kandi Wulfert, the supervisor on duty, about Mr. Cropp's Alzheimer's disease. Mrs. Cropp spoke with Mr. Cropp by phone, and he told her he was frightened and confused about why he was in jail. When she learned that her husband needed to sign paperwork, she explained his disability to Wulfert. She emphasized that although Mr. Cropp could not understand the forms by reading them, "if you sit down and go over it and say this is what this says, he can understand that." She implored Wulfert to "let [her] sit down next to him so [she] could show him the documents and go over it so he would have true understanding and sign a document that he understood." Mrs. Cropp explained that she "needed to sit down next to him" because she had been working with him since his Alzheimer's symptoms started and knew she could help him understand documents in this manner.

She was told that such in-person communication would violate Jail policy prohibiting contact visits between inmates and family members. <u>In other words, she was told there would be no such accommodation.</u> Although inmates are permitted to meet face-to-face with attorneys in the booking lobby, Wulfert refused to allow the Cropps to meet in person.[2] There was no staffing shortage at the Jail that night. No one claimed Mr. or Mrs. Cropp were dangerous. Instead of seriously considering the

---

[2] Wulfert and a County representative offered conflicting testimony in their depositions regarding whether attorney visits are allowed overnight. The County's representative stated that attorney visits were not allowed from 10:00 p.m. to 5:30 a.m. Wulfert said that policies regarding contact visits were the same during the day and night shifts, and that attorney visits happening overnight would occur in the corner of the lobby. She acknowledged that she had not seen this done.

-5-

Cropps' request, Wulfert simply explained that for inmates with cognitive disabilities who are booked overnight, the Jail's practice is to hold the inmate until morning, when counseling staff arrive. Wulfert later admitted that in denying the Cropps' request, she did not consider whether her denial would impose any particular burden on the Jail other than violating the Jail's policies, and she could not think of any burden that an in-person visit would have imposed.

Wulfert did not offer the Cropps any alternative other than that provided to any non-disabled person: use the Jail's visitation booth, where they could see each other through a thick glass wall and communicate using telephones. The County offers the visitation booth to all inmates and family members. Mrs. Cropp declined to use the visitation booth and explained to Wulfert that based on her years of helping her husband, she knew the visitation booth would not allow them to communicate effectively because it "would not be a reasonable way to explain to a man with Alzheimer's a complicated legal document." She later testified that she could not "have explained a legal document to a man with Alzheimer's through a glass with a phone at my ear and him listening with a phone, no. I needed to sit down next to him."

After Wulfert refused to permit the Cropps a contact visit, she allowed Mrs. Cropp to speak with her supervisor, a lieutenant, by phone. By this time, it was approximately 3 a.m. The lieutenant had the authority to permit an exception to the policy banning in-person visits, but Wulfert never asked the lieutenant to consider doing so. The lieutenant told Mrs. Cropp that because Mr. Cropp would not sign the

-6-

appearance-bond form, the Jail would not release him that night and he would remain in custody until a hearing the following afternoon at 1:30 p.m.

The next morning, resigned to not comprehending the forms, Mr. Cropp signed them. He had been detained for approximately eleven hours. Had he been able to understand the forms, he would have been released after an hour or two.

## II

I concur in my colleagues' conclusion that the Cropps lack standing to pursue injunctive relief. (Majority Order & J. 6-7.) The majority correctly details the general standards applicable to the ADA and Rehabilitation Act claims before us. And my colleagues appropriately reject the district court's characterization of the service at issue as access to a physical contact visit. (Id. at 10.) However, I would squarely hold that the Cropps created material disputes of fact on the questions of meaningful access and deliberate indifference.

## A

The ADA and Rehabilitation Act require more than mere "physical access to public entities"; rather, they require "public entities to provide meaningful access to their programs and services." Robertson v. Las Animas Cty. Sheriff's Dep't, 500 F.3d 1185, 1195 (10th Cir. 2007) (quotation omitted). Department of Justice regulations further mandate "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability." 28 C.F.R. § 35.130(b)(7). For inmates with disabilities that affect communication, this means taking "appropriate steps to ensure that communications

-7-

with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." § 35.160(a)(1).

As the majority notes, public facilities are not obligated to provide the exact accommodation requested by a disabled individual if they can demonstrate that "another effective means of communication exists." (Majority Order & J. 16 (quoting 28 C.F.R. pt. 35, app. A, § 35.160.)) However, a public facility "shall give primary consideration to the requests of individuals with disabilities." § 35.160(b)(2). The importance of deference to the individual's requested accommodation is echoed in the appendix to the Department of Justice's implementing regulations: "The public entity shall honor the choice of the individual with a disability unless it can demonstrate that another effective means of communication exists or that use of the means chosen would not be required under § 35.164." 28 C.F.R. pt. 35, app. A (quotation and alteration omitted).[3]

The record demonstrates the County failed to afford primary consideration to the Cropps' request for an accommodation. When Mrs. Cropp asked Jail personnel to permit her to sit with Mr. Cropp to explain the documents, Wulfert immediately shut down any prospect of an in-person visit because it violated Jail policy. Wulfert did not investigate whether it would be possible to allow an exception. When on the phone with her supervising lieutenant, who had the authority to permit an exception,

---

[3] Section 35.164 "does not require a public entity to take any action that it can demonstrate would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." Id.

-8-

she did not ask the lieutenant to consider one. Wulfert did not take any action whatsoever to consider the Cropps' request. And the County has not produced other evidence showing that the lieutenant or any other employee considered it. At a minimum, the primary consideration owed by a public facility under § 35.160(b)(2) must require some examination of the facility's ability to grant the request.

The County has also failed to carry its burden of demonstrating that the Cropps' requested accommodation "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens." § 35.164. Such a decision "must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the service, program, or activity and must be accompanied by a written statement of the reasons for reaching that conclusion." Id. The County has not produced a written statement of reasons. Instead, the County relies on the deposition testimony of its representative that security concerns prevent it from altering its policy for any reason, including disability. When asked whether she could think of an undue burden that an in-person visit would have imposed in this case, Wulfert said she could not think of one. This unbending rigidity is unacceptable under § 35.160. See Chisholm v. McManimon, 275 F.3d 315, 327 (3d Cir. 2001) (noting that "general references to 'security' issues . . . not supported by any showing that 'security' in fact is implicated in making available to an inmate at appropriate times the services and aids . . . requested" is insufficient).

Moreover, the Cropps have identified evidence indicating that it would not have been an undue burden for the County to accommodate their request. The County permits attorneys to meet in-person with their clients in the booking lobby adjacent to the area in which Mr. Cropp was being held.[4] And because the Jail was fully staffed that evening, the County could have assigned officers to watch or restrain Mr. Cropp, thereby adding an additional layer of security.

Although the majority notes that it does not need to determine whether the visitation booth would have been effective, it nonetheless points to the visitation booth as "nearly identical" to the in-person visit requested by the Cropps. (Majority Order & J. 20.) But the majority fails to address the key difference between a glass-enclosed visitation booth and an in-person visit: the thick glass wall physically separating the Cropps prevented Mrs. Cropp from sitting next to her husband and assisting him with the form. Given Mrs. Cropp's adamant statements that the visitation booth would not permit her to communicate effectively with Mr. Cropp, this difference cannot be overlooked.

The majority ignores Mrs. Cropp's repeated statements in absolute terms that the visitation booth would not allow her to explain the forms to her husband. She testified: "I don't think I could have explained a legal document to a man with

---

[4] As noted above, two County witnesses gave inconsistent testimony as to whether attorneys were allowed to meet with clients during the night shift. Because this case was decided on summary judgment, we view the facts in the light most favorable to the Cropps as the nonmoving parties. Knopf v. Williams, 884 F.3d 939, 946 (10th Cir. 2018). Therefore, I construe the evidence to show that attorney visits could be permitted in the booking lobby overnight.

Alzheimer's through a glass with a phone at my ear and him listening with a phone, no. I needed to sit down next to him." She stated that she told Jail staff the visitation booth "would not be a reasonable way to explain to a man with Alzheimer's a complicated legal document." She further testified: "I can't do that between—with that glass between us. I cannot do that as well: Do you see this here; this is what it's saying to you. I can't do that." The majority places great weight on Mrs. Cropp's use of "as well", concluding that her repeated, forceful statements that the visitation booth would not have provided effective communication meant only that she understood it not to be <u>as</u> effective as the requested in-person visit. (Majority Order & J. 21-22, n.13.) This characterization ignores her testimony that the visitation booth would not allow Mr. Cropp to understand the form, and therefore, to access a level of communication substantially equal to the communication afforded to other inmates at the Jail.

Rather than offering any affirmative evidence to carry its burden of showing that the visitation booth would have effectively provided access to communication for Mr. Cropp, the County blames Mrs. Cropp for its utter lack of evidence. It asserts that her refusal to use the visitation booth makes it impossible to ascertain whether the booth would have been effective. This argument mistakes Mrs. Cropp's burden. Although a public entity may rely on a person accompanying the individual with disabilities to help with communication, "[t]he public entity may not coerce or attempt to persuade another adult to provide effective communication for the individual with a disability." 28 C.F.R. pt. 35, app. A. The County could not force

-11-

Mrs. Cropp to use the booth, thus her refusal to so participate eliminated the booth as a potential accommodation. Moreover, her refusal does not extinguish the County's burden to show that it offered Mr. Cropp an accommodation that would have been effective.

Forcing inmates with disabilities to use existing services, when their disabilities make "meaningful access" to those services impossible, is exactly the type of discrimination that the ADA and the Rehabilitation Act are designed to prevent. As Congress observed in passing the ADA, "individuals with disabilities continually encounter various forms of discrimination, including . . . failure to make modifications to existing facilities and practices." 42 U.S.C.S. § 12101(a)(5). This is precisely the type of discrimination Mr. Cropp encountered at the Larimer County Jail. I underscore the fact that the County never provided Mr. Cropp with an accommodation. The required means of communication for all inmates wishing to communicate with their families, the thick glass wall and telephone, was not a service or an accommodation. In what amounts to nothing less than a legerdemain, the majority proposes to call the visitation booth an accommodation when it is not an accommodation at all for anyone. It is simply the required means of communication for all inmates. Calling the visitation booth an accommodation is akin to calling the Jail itself an accommodation, open to all, the abled and disabled alike.

Instead of providing an accommodation, the County's standard practice for inmates with cognitive disabilities who cannot understand forms is to hold them overnight until counseling staff arrive in the morning. Under this practice, non-

-12-

disabled inmates can avail themselves of immediate release upon signing paperwork, but inmates with disabilities are forced to remain incarcerated. This is no way to treat patients with Alzheimer's. Leaving Mr. Cropp to freeze in a cell overnight because the Jail refused to provide an accommodation, modify its policies, or call in a staff member trained to provide such accommodations is the epitome of the "thoughtlessness and indifference" and "benign neglect" that undergirds discrimination against people with disabilities. Alexander v. Choate, 469 U.S. 287, 295 (1985). I would hold that factual disputes preclude summary judgment on whether the County discharged its obligation to provide Mr. Cropp meaningful access to its services.

**B**

Declining to address meaningful access, the majority holds that no reasonable jury could find the County acted with deliberate indifference. (Majority Order & J. 13.) To demonstrate deliberate indifference, a plaintiff must prove "(1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." Barber ex rel. Barber v. Colo. Dep't of Revenue, 562 F.3d 1222, 1229 (10th Cir. 2009) (quotation and alteration omitted). Deliberate indifference is a higher standard than negligence and requires proof of deliberate action. J.V. ex rel. C.V. v. Albuquerque Pub. Sch., 813 F.3d 1289, 1298 (10th Cir. 2016). The Cropps present two theories to demonstrate deliberate indifference: the County failed to accommodate Mr. Cropp's disability, and the County failed to train its personnel.

**i**

I agree with the majority that it is not per se deliberate indifference for a public facility to refuse to provide a requested accommodation. (Majority Order & J. 16-18.) That rule, however, does not excuse the County's inaction in this case. When the County denied the Cropps an in-person visit, it was on notice that: (1) Mr. Cropp had Alzheimer's disease, which made it impossible for him to comprehend the form on his own; (2) his wife and caretaker believed he could comprehend the form if she was able to sit with him to explain it; and (3) she could not explain the form to him through the visitation booth's glass window, and would not attempt to do so. Based on the information about Mr. Cropp's disability that Mrs. Cropp provided, harm to Mr. Cropp's ADA and Rehabilitation Act rights without accommodation was not just "substantially likely," it was virtually certain.

Armed with this knowledge, the County did essentially nothing. The majority concludes that the County could not have known that it was substantially likely that the booth would be ineffective because it considers in-person visits and the visitation booth to be physically similar. (Majority Order & J. 20-22.) It also discounts Mrs. Cropp's repeated insistence that the visitation booth would not be an effective accommodation. (Id.) Although it is correct that Mrs. Cropp may have initially offered to explain the forms to Mr. Cropp utilizing the thick glass separation available, upon realizing that this was something she could not do, she told Jail officials so. Their response was effectively take it or leave it. The County should have offered an effective means of communication. It did not do so.

-14-

The County took no further action to accommodate Mr. Cropp. It did not modify or consider modifying any of its existing services to accommodate him. Wulfert's lieutenant had the authority to order an exception to the Jail's policy on in-person visitation or to provide another modification or accommodation to allow Mr. Cropp access to the form, but took no action. See Updike v. Multnomah Cty., 870 F.3d 939, 954 (9th Cir. 2017) ("A denial of a request without investigation is sufficient to survive summary judgment on the question of deliberate indifference.").[5] From intake to release, the Jail applied the same policies to Mr. Cropp that it applies to non-disabled inmates, without considering whether they would effectively accommodate Mr. Cropp's disability. This is a profound failure to act. I would conclude that the Cropps have provided adequate evidence of deliberate indifference for a reasonable jury to rule in their favor.[6]

---

[5] The majority states that the Cropps did not argue the County was deliberately indifferent in refusing an in-person visit without investigating whether the County could provide such a visit to Mr. Cropp. (Majority Order & J. 15 n.10.) To the contrary, the Cropps have repeatedly argued that the County intentionally and summarily denied their request without the required "primary consideration," § 35.160(b)(2), standing instead on its absolute policy that the provided visitation booth had to be utilized.

[6] Both the district court and the majority reject Mrs. Cropp's associational claims as dependent upon Mr. Cropp's claims. (Majority Order & J. 26-27.) Because I would reverse the district court's grant of summary judgment on Mr. Cropp's failure-to-accommodate claim, I would remand Mrs. Cropp's associational claims for further consideration by the district court in the first instance.

-15-

**ii**

On the Cropps' failure-to-train claim, the majority concludes that the Cropps did not provide adequate evidence to show the County "was on notice of the need for more or better training." (Majority Order & J. 24 (citing <u>J.V.</u>, 813 F.3d at 1298).) I agree with my colleagues that the Cropps' evidence that the Department of Justice was investigating the County for failing to accommodate deaf individuals was ultimately insufficient to put the County on notice absent further information connecting the investigation to Mr. Cropp's experience. However, there is substantial evidence in the record showing that Jail personnel's failure to accommodate Mr. Cropp by rigidly adhering to policy perfectly accorded with the County's training. Moreover, none of the County's employees were able to identify any training they received regarding accommodating inmates with Alzheimer's disease. This is disturbing. Although the majority allows the County to escape liability today, its personnel desperately need training on how to accommodate this vulnerable population.

**III**

A reasonable jury could conclude that the County deprived Mr. Cropp of meaningful access to its services and, in doing so, acted with deliberate indifference to the strong likelihood that his federally protected rights were violated. Accordingly, I would reverse that part of the district court's grant of summary judgment and remand for further proceedings. As things stand, tonight another Alzheimer's patient somewhere in the six states of our circuit may be similarly

-16-

treated.  We should not allow this kind of indifference to those suffering from Alzheimer's to persist.  If law enforcement officers propose to arrest Alzheimer's patients for the simple act of walking around the block, then jail personnel had best be prepared to accommodate the disabilities of those patients when clearly advised of the patients' condition.  I respectfully dissent.